**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NANCY GAGNON, Individually and On Behalf of All Others Similarly Situated,<br><div align="right">Plaintiff,</div><br>v.<br><br>ALKERMES PLC, RICHARD F. POP and JAMES M. FRATES,<br><div align="right">Defendants.</div> | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Nancy Gagnon ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alkermes plc ("Alkermes" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Alkermes securities between February 24, 2015 and November 3, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and

to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Alkermes plc is a biopharmaceutical company focused on the development of treatments for central nervous system disorders such as addiction, schizophrenia, depression and diabetes.  The Company's marketed products include Vivitrol (naltrexone for extended-release injectable suspension), a treatment for alcohol and opioid dependence.

3.      Founded in 1987, the Company is headquartered in Dublin, Ireland, and its stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "ALKS."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Alkermes systemically engaged in deceptive marketing campaigns to influence policymakers to use Vivitrol in addiction treatment programs over more scientifically proven and efficacious alternatives; (ii) the foregoing conduct, when disclosed, would foreseeably subject Alkermes to heightened regulatory and legislative scrutiny; (iii) accordingly, the Company's revenues derived from Vivitrol during the Class Period were unsustainable; and (iv) as a result of the foregoing, Alkermes shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

5.      On November 6, 2017, U.S. Senator Kamala Harris announced the opening of an investigation into Alkermes' sales practices for Vivitrol.  Senator Harris specifically stated that the Company "aggressively marketed" its medication, convincing judges and prison officials to use it rather than more proven addiction-treatment products, and spent hundreds of thousands of

dollars lobbying policymakers.  According to Harris, Alkermes promoted Vivitrol by using a "speaker's bureau composed of doctors paid to promote the drug."

6.     On this news, Alkermes' share price fell $2.23, or 4.37%, to close at $48.76 on November 6, 2017.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

<u>**JURISDICTION AND VENUE**</u>

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Alkermes' stock trades on the NASDAQ, located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Alkermes securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Alkermes is incorporated in Ireland, with principal executive offices located at Connaught House, 1 Burlington Road, Dublin 4 L2 00000.  Alkermes' shares trade on the NASDAQ under the ticker symbol "ALKS."

14.     Defendant Richard F. Pops ("Pops") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman.

15.     Defendant James M. Frates ("Frates") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Senior Vice President and Treasurer.

16.     The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of Alkermes' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

4

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Alkermes plc is a biopharmaceutical company focused on the development of treatments for central nervous system disorders such as addiction, schizophrenia, depression and diabetes.  The Company's marketed products include Vivitrol (naltrexone for extended-release injectable suspension), a treatment for alcohol and opioid dependence.

### Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on February 24, 2015, when Alkermes filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, the Company reported net income of $30.51 million, or $0.20 per diluted share, on revenue of $175.16 million, compared to net income of $18.08 million, or $0.12 per diluted share, on revenue of $154.48 million for the same period in the prior year.  For 2014, the Company reported a net loss of $30.06 million, or $0.21 per diluted share, on revenue of $618.79 million, compared to net income of $20.65 million, or $0.15 per diluted share, on revenue of $596.33 million for 2013.

20.     In the 2014 10-K, the Company stated, in relevant part:

VIVITROL is a once-monthly injectable medication approved in the U.S. and Russia for the treatment of alcohol dependence and for the prevention of relapse to opioid dependence, following opioid detoxification. VIVITROL uses our polymer-based microsphere injectable extended-release technology to deliver and maintain therapeutic medication levels in the body through just one injection every four weeks. We developed, and currently market and sell, VIVITROL in the U.S., and Cilag sells VIVITROL in Russia and the CIS.

\*\*\*

We are responsible for the marketing of VIVITROL in the U.S. We focus our sales and marketing efforts on specialist physicians in private practice and in

public treatment systems. ***We use customary pharmaceutical company practices to market our product and to educate physicians***, such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives, public relations and other methods. We provide, or contract with third-party vendors to provide, customer service and other related programs for our product, such as product-specific websites, insurance research services and order, delivery and fulfillment services. Our sales force for VIVITROL in the U.S. consists of approximately 70 individuals. VIVITROL is sold directly to pharmaceutical wholesalers, specialty pharmacies and a specialty distributor. Product sales of VIVITROL during the year ended December 31, 2014 to CVS Caremark Corporation and McKesson Corporation represented approximately 17% and 15%, respectively, of total VIVITROL sales.

(Emphasis added.)

21.     The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22.     On April 30, 2015, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, the Company reported a net loss of $30.66 million, or $0.21 per diluted share, on revenue of $161.21 million, compared to a net loss of $24.35 million, or $0.17 per diluted share, on revenue of $130.21 million for the same period in the prior year.

23.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On July 30, 2015, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, the Company reported a net loss of $46.11 million, or $0.31

per diluted share, on revenue of $151.37 million, compared to net income of $3.74 million, or $0.02 per diluted share, on revenue of $153.42 million for the same period in the prior year.

25.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On October 29, 2015, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, the Company reported a net loss of $81.02 million, or $0.54 per diluted share, on revenue of $152.65 million, compared to a net loss of $39.96 million, or $0.27 per diluted share, on revenue of $159.99 million for the same period in the prior year.

27.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     On February 25, 2016, Alkermes filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, the Company reported a net loss of $69.38 million, or $0.46 per diluted share, on revenue of $163.10 million, compared to net income of $30.51 million, or $0.20 per diluted share, on revenue of $175.16 million for the same period in the prior year.  For 2015, the Company reported a net loss of $227.16 million, or $1.52

per diluted share, on revenue of $628.34 million, compared to a net loss of $30.06 million, or

$0.21 per diluted share, on revenue of $618.79 million for 2014.

29.     In the 2015 10-K, the Company stated, in relevant part:

VIVITROL (naltrexone for extended-release injectable suspension) is the only once-monthly, non-addictive, injectable medication approved in the U.S., Russia and certain of the CIS for the treatment of alcohol dependence and for the prevention of relapse to opioid dependence, following opioid detoxification. VIVITROL uses our polymer-based microsphere injectable extended-release technology to deliver and maintain therapeutic medication levels in the body through one injection every four weeks. We developed, manufacture and commercialize VIVITROL in the U.S., and Cilag commercializes VIVITROL in Russia and certain countries of the CIS.

*** 

We are responsible for the marketing of VIVITROL and ARISTADA in the U.S. We focus our sales and marketing efforts on specialist physicians in private practice and in public treatment systems. ***We use customary pharmaceutical company practices to market our product and to educate physicians***, such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives, public relations and other methods. We provide, or contract with third-party vendors to provide, customer service and other related programs for our products, such as product-specific websites, insurance research services and order, delivery and fulfillment services.

Our sales force for VIVITROL in the U.S. consists of approximately 70 individuals. VIVITROL is sold directly to pharmaceutical wholesalers, specialty pharmacies and a specialty distributor. Product sales of VIVITROL during the year ended December 31, 2015 to McKesson Corporation, CVS Caremark Corporation and Cardinal Health represented approximately 17%, 15% and 10%, respectively, of total VIVITROL sales.

(Emphasis added.)

30.     The 2015 10-K contained signed certifications pursuant to SOX by the Individual

Defendants, stating that the financial information contained in the 2015 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

31.     On April 28, 2016, Alkermes filed a quarterly report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended March 31, 2016

8

(the "Q1 2016 10-Q").  For the quarter, the Company reported a net loss of $77.42 million, or $0.51 per diluted share, on revenue of $156.77 million, compared to a net loss of $30.66 million, or $0.21 per diluted share, on revenue of $161.21 million for the same period in the prior year.

32.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.    On July 28, 2016, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, the Company reported a net loss of $47.19 million, or $0.31 per diluted share, on revenue of $195.17 million, compared to a net loss of $46.11 million, or $0.31 per diluted share, on revenue of $151.37 million for the same period in the prior year.

34.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.    On November 2, 2016, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, the Company reported a net loss of $62.69 million, or $0.41 per diluted share, on revenue of $180.24 million, compared to a net loss of $81.02 million, or $0.54 per diluted share, on revenue of $152.65 million for the same period in the prior year.

36.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On February 17, 2017, Alkermes filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For the quarter, the Company reported a net loss of $21.14 million, or $0.14 per diluted share, on revenue of $213.51 million, compared to a net loss of $69.38 million, or $0.46 per diluted share, on revenue of $163.10 million for the same period in the prior year.  For 2016, the Company reported a net loss of $208.44 million, or $1.38 per diluted share, on revenue of $745.69 million, compared to a net loss of $227.16 million, or $1.52 per diluted share, on revenue of $628.34 million for 2015.

38.     In the 2016 10-K, the Company stated, in relevant part:

> VIVITROL (naltrexone for extended-release injectable suspension) is the only once-monthly, non-addictive, injectable medication approved in the U.S., Russia and certain countries of the CIS for the treatment of alcohol dependence and for the prevention of relapse to opioid dependence, following opioid detoxification. VIVITROL uses our polymer-based microsphere injectable extended-release technology to deliver and maintain therapeutic medication levels in the body through one intramuscular injection every four weeks. We developed and exclusively manufacture VIVITROL. We commercialize VIVITROL in the U.S., and Cilag commercializes VIVITROL in Russia and certain countries of the CIS.

<p style="text-align:center">***</p>

> We are responsible for the marketing of VIVITROL and ARISTADA in the U.S. We focus our sales and marketing efforts on specialist physicians in private practice and in public treatment systems. ***We use customary pharmaceutical company practices to market our product and to educate physicians,*** such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives and other methods. We provide, or contract with third-party vendors to provide, customer service and

other related programs for our products, such as product-specific websites, insurance research services and order, delivery and fulfillment services.

Our sales force for VIVITROL in the U.S. consists of approximately 90 individuals. VIVITROL is sold directly to pharmaceutical wholesalers, specialty pharmacies and a specialty distributor. Product sales of VIVITROL during the year ended December 31, 2016 to AmerisourceBergen Corporation ("AmerisourceBergen"), McKesson Corporation, Cardinal Health and CVS Caremark Corporation represented approximately 19%, 18%, 13% and 12%, respectively, of total VIVITROL sales.

(Emphasis added.)

39.     The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On April 27, 2017, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").  For the quarter, the Company reported a net loss of $68.88 million, or $0.45 per diluted share, on revenue of $191.78 million, compared to a net loss of $77.42 million, or $0.51 per diluted share, on revenue of $156.77 million for the same period in the prior year.

41.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     The statements referenced in ¶¶ 19-41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Alkermes had engaged in deceptive marketing campaigns to influence policymakers to use

Vivitrol in addiction treatment programs over more scientifically proven and efficacious alternatives; (ii) the foregoing conduct, when disclosed, would foreseeably subject Alkermes to heightened regulatory and legislative scrutiny; (iii) accordingly, the Company's revenues derived from Vivitrol during the Class Period were unsustainable; and (iv) as a result of the foregoing, Alkermes shares traded at artificially inflated prices during the Class Period, and class members suffered significant losses and damages.

### The Truth Begins to Emerge

43.     On June 11, 2017, *The New York Times* published an article entitled "Seizing On Opioid Crisis, a Drug Maker Lobbies Hard for its Product."  The article described Alkermes' aggressive efforts to market Vivitrol while denigrating the efficacy of other addiction treatments, stating, in part:

> Five years ago, Vivitrol was a treatment for opioid addiction that was struggling to find a market. Now, its sales and profile are rising fast, thanks to its manufacturers' shrewd use of political connections, and ***despite scant science to prove the drug's efficacy.***

> Last month, the health and human services secretary, Tom Price, praised it as the future of opioid addiction treatment after visiting the company's plant in Ohio. He set off a furor among substance abuse specialists by criticizing its less expensive and more widely used and rigorously studied competitors, buprenorphine and methadone, as medications that "simply substitute" for illicit drugs.

> It was the kind of plug that Vivitrol's maker, Alkermes, has spent years coaxing, with a deft lobbying strategy that has targeted lawmakers and law enforcement officials. The company has spent millions of dollars on contributions to officials struggling to stem the epidemic of opioid abuse. It has also provided thousands of free doses to encourage the use of Vivitrol in jails and prisons, which have by default become major detox centers.

> \*\*\*

> The company's strategy highlights the profit opportunities that drug companies and investors see in an opioid epidemic that killed 91 Americans every day in 2015 and is growing worse. But ***some of its marketing tactics***, and Mr. Price's

comments, *ignore widely accepted science*, as nearly 700 experts in the field wrote the health secretary in a letter.

*Not a single study has been completed comparing Vivitrol with its less expensive competitors.* Some studies have shown high dropout rates, or found that many participants returned to opioid use while taking Vivitrol or after going off it. In one study that the company used to secure the Food and Drug Administration's approval of Vivitrol for opioid addiction treatment, conducted with 250 patients in Russia, nearly half of those who got Vivitrol failed to stay abstinent over a six-month period, although they stayed abstinent and in treatment longer than those who got a placebo.

***

"If you care about actually solving the problem, you cannot stigmatize the most effective treatments," said Dr. Joshua Sharfstein, a former Maryland health secretary who is now an associate dean at the Johns Hopkins Bloomberg School of Public Health. "*This is a company that has put its own perverted idea of market success ahead of actually solving the problem*."

As health secretary, he said, he had to call a meeting to tell Alkermes to "back off talking down methadone and buprenorphine" to legislators as the company aggressively lobbied to get Maryland to use Vivitrol.

"They're exploiting a stigma that exists out of a very narrow view of their own economic self-interest," he said. "And the result is going to be more people dying if they cannot get access to effective treatment."

(Emphases added.)

44.     Following this new, Alkermes' share price fell $2.19, or 3.55%, to close at $59.47 on June 12, 2017.

45.     On July 27, 2017 Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 10-Q").  For the quarter, the Company reported a net loss of $43 million, or $0.28 per diluted share, on revenue of $218.84 million, compared to a net loss of $47.19 million, or $0.31 per diluted share, on revenue of $195.17 million for the same period in the prior year.

46.     The Q2 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On August 3, 2017, Alkermes issued a press release entitled "Corporate Response to Recent Media Articles About Alkermes and Vivitrol".  The press release stated, in part:

> Alkermes is disappointed with some of the recent media coverage about our company and Vivitrol® (naltrexone for extended-release injectable suspension), and FDA-approved product for the prevention of relapse to opioid dependence, following opioid detoxification.  The opioid epidemic is the public health crisis of our time, and the number of Americans impacted by this chronic disease is growing at a devastating rate.  Unfortunately, the vast majority of people suffering from opioid dependence are not receiving treatment for their disease.  Alkermes is committed to helping address this serious disease with Vivitrol.
>
> ***
>
> The FDA approved Vivitrol following a demonstration of safety and efficacy in clinical studies for each of its two indications.  To date, more than 180 scientific articles have been published about Vivitrol.  And since its approval, tens of thousands of patients have been treated with Vivitrol.
>
> Alkermes believes that patients battling opioid dependence need access to all FDA-approved medications and that each medication has an important part to play within the treatment paradigm. . . .

48.     On September 28, 2017, Alkermes issued a press release entitled "Alkermes CEO Richard Pops Testified at President's Commission on Combating Drug Addiction and the Opioid Crisis," where it stated in relevant part:

> Alkermes CEO Richard Pops joined government, nonprofit, and business organizations at the Third Meeting of the President's Commission on Combating Drug Addiction and the Opioid Crisis to testify in support of the Commission's ongoing effort to discuss innovative solutions to address the opioid crisis.
>
> ***
>
> •      The role of VIVITROL® (naltrexone for extended-release injectable suspension), an FDA-approved medicine for the prevention of relapse to opioid

dependence, following opioid detoxification. ***VIVITROL offers patients, clinicians and the community a treatment option that has no risk of abuse and that is not diverted, traded or sold illicitly on the street.***

(Emphasis added.)

49.     On October 26, 2017, Alkermes filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 10-Q").  For the quarter, the Company reported a net loss of $36.28 million, or $0.24 per diluted share, on revenue of $217.39 million, compared to a net loss of $62.69 million, or $0.41 per diluted share, on revenue of $180.24 million for the same period in the prior year.

50.     The Q3 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     On that same day, Alkermes issued a press release entitled "Alkermes Supports White House Declaration of Nationwide Public Health Emergency to Combat Opioid Crisis," in response to President Trump's statements concerning the nationwide public health opioid crisis. The press release stated in relevant part:

> In response to today's White House news conference, Alkermes fully supports the President's declaration of a nationwide public health emergency to more aggressively address the growing opioid crisis. Drug overdose deaths exceeded 64,000 in 2016.  This is the crisis of our time, and we must work together to reverse the trend.
>
> Alkermes has been on the frontlines of the opioid epidemic for years, and we commend the administration for providing additional resources and support to help combat this devastating epidemic that continues to impact our communities and families.  Expanded access to services, such as telemedicine, will help bolster increased access to treatment for patients.

Richard Pops, Chief Executive Officer of Alkermes, commented, "Alkermes is committed to ensuring all Americans have access to treatment, including all FDA-approved medications. Patients need information about and access to all available options."

52.     On November 6, 2017, U.S. Senator Kamala Harris announced the opening of an investigation into Alkermes' sales practices for Vivitrol.  Senator Harris specifically stated that the Company "aggressively marketed" its medication, convincing judges and prison officials to use it rather than more proven addiction-treatment products, and spent hundreds of thousands of dollars lobbying policymakers.  According to Harris, Alkermes promoted Vivitrol by using a "speaker's bureau composed of doctors paid to promote the drug."

53.     On this news, Alkermes' share price fell $2.23, or 4.37%, to close at $48.76 on November 6, 2017.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Alkermes securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alkermes securities were actively traded on the

16

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Alkermes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alkermes;

- whether the Individual Defendants caused Alkermes to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Alkermes securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Alkermes  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Alkermes securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

18

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alkermes securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Alkermes securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alkermes securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Alkermes' finances and business prospects.

68.      By virtue of their positions at Alkermes, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Alkermes, the Individual Defendants had knowledge of the details of Alkermes' internal affairs.

70.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

20

Alkermes.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alkermes' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Alkermes securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Alkermes' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Alkermes securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.    During the Class Period, Alkermes securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Alkermes securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Alkermes securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Alkermes securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

74.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.     During the Class Period, the Individual Defendants participated in the operation and management of Alkermes, and conducted and participated, directly and indirectly, in the conduct of Alkermes' business affairs.  Because of their senior positions, they knew the adverse non-public information about Alkermes' misstatement of income and expenses and false financial statements.

76.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alkermes' financial condition and results of operations, and to correct promptly any public statements issued by Alkermes which had become materially false or misleading.

77.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Alkermes disseminated in the marketplace during the Class Period concerning Alkermes' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alkermes to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Alkermes within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alkermes securities.

78.     Each of the Individual Defendants, therefore, acted as a controlling person of Alkermes. By reason of their senior management positions and/or being directors of Alkermes, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alkermes to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Alkermes and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alkermes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: November 22, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*

24

Submission Date

2017-11-15 16:52:07

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against against Alkermes plc ("Alkermes" or the "Company")  and, authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Alkermes securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Alkermes securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Alkermes securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.


## Name

Print Name

Nancy Gagnon


## Acquisitions

Configurable list (if none enter none)

| Date Acquired | Number of Shares Acquired | Price per Share Acquired |
| --- | --- | --- |
| 10/21/2016 | 53 | 56.1899 |


## Sales

Configurable list (if none enter none)

| Date Sold | Number of Shares Sold | Price per Share Sold |
| --- | --- | --- |
|  | 0 |  |

## Documents & Message

Your Message


Signature



Full Name
Nancy Gagnon



**ALKERMES PLC (ALKS)**                                                    **Gagnon, Nancy**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES/UNITS | PRICE PER SHARES/UNITS |
|---|---|---|---|
| 10/21/2016 | Purchase | 53 | $56.1899 |