UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NANCY GAGNON, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:17-cv-09178-WHP |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | AMENDED COMPLAINT FOR |
| vs. | : | VIOLATIONS OF THE FEDERAL |
| | : | SECURITIES LAWS |
| ALKERMES PLC, RICHARD F. POPS and JAMES M. FRATES, | : | |
| | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |
| | : | |

Lead Plaintiff Local 731 I.B. of T. Private Scavenger and Garage Attendants Pension Trust Fund ("Plaintiff" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon the investigation of its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by Alkermes plc ("Alkermes" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action against Alkermes on behalf of all persons other than Defendants (defined below) who purchased or otherwise acquired Alkermes common stock between February 24, 2015 and November 3, 2017, inclusive (the "Class Period"), and certain of its officers and directors for violations of the federal securities laws.  Plaintiff brings this action seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Alkermes is a global biopharmaceutical company.  One of its most successful products is Vivitrol, also known as extended release naltrexone, which is used to treat alcohol and opioid dependence.

3.      Opioid abuse has become an epidemic throughout the United States, claiming the lives of tens of thousands of people each year. Recognizing the potential and lucrative market for treating this problem, Defendants embarked on a deceptive marketing campaign to promote Vivitrol as the only viable medication for proper treatment.  As detailed below, as part of their campaign, Defendants misleadingly denigrated other opioid treatment options and aggressively lobbied Vivitrol to increase sales.

4.      Investors, however, were not aware of the improper sales tactics for Vivitrol that were driving the Company's growth.  Throughout the Class Period, Defendants positively described Vivitrol's growth and the "customary pharmaceutical company practices" that it used to promote Vivitrol.  However, Defendants failed to disclose that Alkermes was systemically engaged in deceptive marketing campaigns, which included influencing policymakers to use Vivitrol in addiction treatment programs on the basis that it was the only viable treatment, notwithstanding the existence of more cost effective, and sometimes more beneficial, alternatives.

5.      Defendants were able to successfully execute their deceptive marketing scheme because they promoted Vivitrol directly to drug court judges who lacked adequate medical knowledge and education to make a proper medical assessment.  The conventional market for such treatments is physicians, who are qualified to assess the medical efficacy of Vivitrol.

6.      To this end, Alkermes funneled millions of dollars into campaign funds, pushing state and federal legislators, judges and prison officials to increase regulations against alternative treatment options, making it harder to obtain these alternatives.  Combining this strategy with its deceitful marketing campaign has led pharmaceutical marketing specialists to conclude that Alkermes' policies and procedures are "not pro-public health[, instead they are] anti-public health."

7.      Ultimately, the Company's troubling sales practices began to be revealed when *The New York Times* published an article on June 11, 2017 entitled "Seizing On Opioid Crisis, a Drug Maker Lobbies Hard for its Product."  The article described Alkermes' aggressive efforts to market Vivitrol, including its efforts to disparage the efficacy of other addiction treatments.

8.      In addition to the Company's deceptive sales practices, Defendants misleadingly claimed that patients who used Vivitrol would not relapse into opioid dependence.  In reality, Defendants were aware of a study they submitted as part of their application to the FDA for Vivitrol

showing that the treatment does not always prevent relapse by addicts.  In fact, that study showed that nearly half of the patients who took Vivitrol failed to stay abstinent over the six month period of the study.

9.      Likewise, Defendants also misled investors during the Class Period with statements about how Vivitrol was better than the other two leading treatments because it is purportedly non-addictive, whereas the other treatments can be habit-forming.  Defendants failed to disclose that the other two treatments are medically accepted, that they allow individuals to wean off of opioids, and that this approach – known as agonist, or not requiring the painful and difficult detox process – is considered equally viable as the antagonist approach that Vivitrol requires, which involves the patient having to fully detox before starting the treatment.

10.      Investors learned about the study relating to Vivitrol and the relative success of Vivitrol compared to other opioid treatments in the same *The New York Times* article from June 11, 2017 that described the Company's deceptive sales practices.  In fact, *The New York Times* reported that nearly half of study participants in a trial involving Vivitrol and a placebo failed to stay abstinent over a six month period.  The same article revealed that no study in existence in June 2017 had been completed comparing Vivitrol with the other two treatments.

11.      Defendants' fraudulent conduct ultimately led to U.S. Senator Kamala Harris opening an investigation into Alkermes' sales practices for Vivitrol, which was announced on November 6, 2017, following the last trading day of the Class Period.  In making this announcement, Senator Harris criticized the Company's "aggressive[] market[ing]" of Vivitrol.

12.      As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common stock following disclosure of the Company's deceptive practices

and the subsequent investigation by Senator Harris, Plaintiff and the other Class members have suffered significant losses and damages.

13.    Finally, the Individual Defendants (defined below) were personally motivated to conceal the Company's deceptive marketing practices and the relatively limited efficacy of Vivitrol from its investors.  Specifically, before the disclosure of the adverse information withheld from Alkermes' investors by Defendants, the Individual Defendants took advantage of the artificial inflation in the price of Alkermes stock and sold between *44% and 50%* of their personally-held shares of Alkermes stock for gross proceeds *in excess of $40 million*.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

16.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Alkermes' stock trades on the NASDAQ, located within this District.

17.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

18.     Lead Plaintiff, as set forth in its previously-filed certification, which is incorporated herein by reference, purchased Alkermes securities at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Defendant Alkermes plc is incorporated in Ireland, with its principal executive offices located in Dublin, Ireland.  Although Alkermes is located abroad, it has listed its common stock on the NASDAQ under the ticker symbol "ALKS."

20.     Defendant Richard F. Pops ("Pops") has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman of the Company's board of directors. Defendant Pops signed the Company's annual and quarterly reports, filed on Forms 10-K and 10-Q, respectively, during the Class Period.

21.     Defendant James M. Frates ("Frates") has served at all relevant times as the Company's Chief Financial Officer ("CFO"), Senior Vice President and Treasurer.  Defendant Frates signed the Company's annual and quarterly reports, filed on Forms 10-K and 10-Q, respectively, during the Class Period.

22.     The Defendants referenced above in ¶¶20-21 are sometimes referred to herein as the "Individual Defendants."

23.     The Defendants referenced above in ¶¶19-21 are collectively referred to herein as "Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Alkermes' SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the

Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Alkermes' business.

26.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

27.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Alkermes' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Alkermes common stock would be based upon truthful and

accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Alkermes common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Alkermes' business, operations, and the intrinsic value of Alkermes' common stock, causing Plaintiff and other members of the Class to purchase Alkermes common stock at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

**The Opioid Epidemic**

29.     Every day more than 115 Americans die from an opioid overdose.  The crisis began in the 1990s when physicians began prescribing opioids in greater volumes to relieve acute pain. Patients became dependent on the pain killers and when the doctors stopped writing prescriptions once the patients' injuries healed, some patients began to turn to the cheaper alternative, heroin, which is also an opioid.  Since 2002, the number of opioid overdose deaths has increased from less than 5,000 deaths per year to over 33,000 deaths per year in 2015.

30.     Extended use of opioids leads to a higher tolerance for the drug, and this in turn, requires increasingly higher doses of opiates to achieve a "high" or the feeling of euphoria.  As the user's tolerance increases, the euphoric effect diminishes, and the brain changes so that it requires the drug just to function and fulfill normal daily tasks.  This is what is known as opioid dependence — requiring opioids just to live a "normal" life.  When those suffering from dependency stop taking opioids, they suffer from painful withdrawal symptoms.

31.     There is an important distinction between opioid dependence and opioid addiction. Addiction occurs when users have overwhelming cravings that lead them to compulsively use the

abusive drug despite knowing the harmful consequences. Dependence, in contrast, means that the user depends on the drug to live a normal life.

32.    According to the U.S. Department of Health and Human Services, "[o]pioid addiction is a chronic disease, like heart disease or diabetes. A chronic disease is a medical condition for life. It cannot be cured, but it can be managed. A person with addiction can regain a healthy, productive life."

33.    To combat this debilitating disease, the U.S. Food and Drug Administration ("FDA") has approved three different medications for opioid abuse: (i) methadone; (ii) buprenorphine or buprenorphine-naloxone, commonly referred to by its brand name, Suboxone; and (iii) Vivitrol. All three of these treatments are meant to be taken alongside counseling and other behavioral therapies.

34.    Methadone and buprenorphine are considered agonist treatments. Agonist treatments trigger the opioid receptors in the brain, delivering a mild effect, tricking the brain into thinking it is receiving the abused opioid, while preventing users from feeling the euphoria that opioid users experience. These treatments reduce cravings and prevent users from experiencing withdrawal symptoms, allowing them to lead a normal life. The most commonly administered treatment, Suboxone, is a film that dissolves under the tongue that is taken daily. Due to laws and regulations, buprenorphine prescriptions can only be obtained by specially licensed doctors.

35.    People who take methadone and buprenorphine are not required to endure the tormenting process of detoxification[1] before beginning treatment, which means they can immediately begin treatment once they receive a prescription. Methadone and buprenorphine enable their users to control cravings, withdrawal symptoms, and the feeling of physical dependency to opioids.

_____

[1]    Detoxification requires a user to completely remove all traces of opioids from their system before beginning treatment.

**Alkermes and Vivitrol**

36.     Founded in 1987, Alkermes is a biopharmaceutical company focused on the development of treatments for central nervous system disorders such as addiction, schizophrenia, depression and diabetes.

37.     The Company's marketed products include Vivitrol, a treatment for alcohol and opioid dependence.  Defendants described Vivitrol as key to the Company's success during the Class Period.  For example, in a July 30, 2015 press release issued by Alkermes reporting the Company's second quarter 2015 financial results, defendant Pops stated, in pertinent part, that "[t]oday we are improving our financial expectations for the remainder of 2015, driven by the accelerating quarterly growth in net sales of VIVITROL®, our long-acting injectable medication for the treatment of opioid dependence and alcohol dependence."  Defendants made similar statements throughout the Class Period attesting to the importance of Vivitrol to the Company's revenues and earnings.

38.     Vivitrol, a once-monthly injection, is what is known as antagonist treatment and is the only FDA-approved antagonist opioid treatment.  Antagonist treatments block opioids from reaching the receptors in the brain and prevent its users from feeling the opioid's effect.  This means that Vivitrol prevents users from experiencing the euphoric and sedative effects of the abused drug, thereby curbing the user's cravings.

39.     However, because Vivitrol is an antagonist, not agonist, treatment, users must go through the often painful and excruciating process of fully detoxing before they can begin treatments.  This often leads to high relapse rates because users are unable to complete the grueling process of detoxification before even beginning the treatment.

**Alkermes Deceptively Markets Vivitrol**

40.     Throughout the Class Period, Defendants represented to investors that the Company engaged in "customary pharmaceutical company practices" in promoting their medications.  In truth,

however, Defendants engaged in deceptive marketing practices in order to promote Vivitrol as superior to methadone and buprenorphine, the alternative opioid treatment medications.

41.     For example, Alkermes gave millions of dollars to state and federal legislators, judges, and prison officials in an effort to persuade them to use Vivitrol in special drug court programs and prisons over more well-established, cost effective alternatives.  Defendants realized that influencing legislators, judges, and prison officials was the perfect way to promote Vivitrol because they lack medical training, so they were quickly drawn to Vivitrol when Defendants misleadingly touted it as the only "non-addictive" treatment option and easily biased policymakers against existing treatment options.

42.     But Defendants did more than just influence policymakers to choose Vivitrol over methadone or buprenorphine; they lobbied for regulations that would make it more difficult to obtain any treatment option *other* than Vivitrol.  Obtaining buprenorphine prescriptions is already a fairly difficult process because doctors require a special license to prescribe buprenorphine and each doctor can only write prescriptions for 100 patients.  Despite this, Alkermes lobbied for tougher regulations against buprenorphine, making it more difficult for doctors to prescribe the medication.

43.     Defendants also took the unconventional step of marketing Vivitrol directly to drug court judges.  Drug courts are special state courts that allow judges to handle cases involving substance-abuse charges by ordering offenders to submit to substance abuse medication and therapy programs, drug testing, and other court supervision.  These programs give substance abuse offenders the opportunity to enroll in treatment programs instead of serving prison sentences for the drug charges. The idea is to rehabilitate those who are charged, enabling them to contribute to society while decreasing recidivism.

- 10 -

44.     Alkermes' aggressive lobbying efforts come at the expense of those who are in court-mandated treatment programs and prisons.  This is because Defendants influenced lawmakers, judges, and prison officials to adopt programs that offer opioid users facing criminal charges one of two options: either jail time or Vivitrol.  Yet, as studies have shown, and many critics have pointed out, Vivitrol is not for everyone.  Opioid treatment is not a one-size-fits-all program and many prefer alternative treatment options.  In fact, many people choose alternative treatment options because of the harrowing side effects they experience while on Vivitrol, like hallucinations and other adverse effects.  Moreover, Vivitrol should not be used by women who are pregnant or people suffering from chronic pain.  By forcing opioid users to choose between jail time or Vivitrol, Defendants are essentially putting opioid users between the proverbial "rock and a hard place."

45.     Defendants' deceptive marketing and zealous lobbying caused Alkermes common stock to trade at artificially high prices, as the revenues recognized from these efforts were unsustainable and also caused the Company to be subjected to heightened regulatory and legislative scrutiny.

### Vivitrol is Misleadingly Promoted as the
### Only Non-Addictive Treatment for Opioid Addiction

46.     Defendants deceptively promoted Vivitrol as the only non-*addictive* treatment option for opioid addiction when, in actuality, it is the only non-*dependent* treatment option.  By falsely promoting Vivitrol as the only non-addictive treatment option, the Company misleadingly disparaged alternative treatment options because describing Vivitrol as the only non-addictive treatment option implies that the other treatment options are addictive.  This is untrue, as widely-accepted scientific findings establish the efficacy of these other options.

47.     Not only are Defendants denigrating well-established treatment options and stigmatizing those who use methadone or buprenorphine by labeling them as drug addicts,

Defendants are also falsely promoting Vivitrol as "competitors" of methadone and buprenorphine when, in fact, they are distinct treatment options. Because methadone and buprenorphine are agonist treatments, they deliver a mild effect of opioids, helping users live a life of sobriety without having to endure the painful detox process. Vivitrol, on the other hand, is an antagonist medication that blocks opioid receptors from experiencing any of the abused drug's effects. As medical professionals have noted, comparing the two creates a "really an unfortunate dynamic. . . . [t]hey're not designed to do the same thing. It's like comparing apples and oranges." Medical professionals consider both to be valid approaches and no study existed as of June 2017 that compared the efficacy of Vivitrol with the other two treatments.

### Defendants Misleadingly Stated that Vivitrol Users Do Not Relapse

48.     Vivitrol is marketed as a drug that will prevent its users from relapsing to opioid use when studies clearly show otherwise. Indeed, Alkermes' own studies show that some participants relapsed to opioid use while on Vivitrol. In 2010, Alkermes conducted a study in Russia – where methadone and buprenorphine are illegal – comparing Vivitrol to placebos. The medical community greatly questioned why Alkermes chose to conduct a study: (i) in a country where the only alternative treatment medications are outlawed; and (ii) where Vivitrol was only measured against a placebo. Nevertheless, the study showed that Vivitrol is not the "miracle drug" Defendants tout it as – over thirty percent of participants relapsed to opioid use.

49.     Moreover, an article published in ProPublica on June 27, 2017, titled "The Last Shot," describes how a woman who was on Vivitrol fatally overdosed when she tried to override the Vivitrol with a large dose of opioids.

### Defendants Were Motivated to Artificially Inflate Alkermes' Stock

50.     While Defendants' materially false and misleading statements caused Alkermes common stock to trade at artificially inflated prices during the Class Period, Company insiders sold

over 1.7 million shares of their personally-held stock for gross proceeds of over $102 million, with the Individual Defendants alone selling between **44% and 50%** of their personally-held shares of Alkermes stock for gross proceeds **in excess of $40 million**.

### Alkermes' Class Period SEC Filings Did Not Comply with SEC Disclosure Regulations

51.     Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among other things, Item 303 of Regulation S-K required that Alkermes' Class Period Forms 10-K and 10-Q disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

52.     In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.  In particular, the interpretative guidance states specifically that when an SEC registrant knows that a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, disclosure is required.  The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

> *       *       *

> ***Events that have already occurred*** or are anticipated ***often give rise to known uncertainties***.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  ***In situations such as these, a registrant would have identified a known uncertainty reasonably***

- 13 -

*likely to have material future effects on its financial condition or results of operations, and disclosure would be required*.[2]

53.    In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303.  Such guidance states, in pertinent part:

> *We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication*.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

54.    Thus, the MD&A disclosures in Alkermes' Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends associated with their efforts to misleadingly disparage competitive treatment options for opioid addiction so that Vivitrol would be the exclusive treatment for prisoners in drug courts.  These efforts were known to management and were reasonably likely to have a material effect on the Company's future operating results.

55.    In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk Factors*.  Item 503 of Regulation S-K required that Alkermes' Class Period Forms 10-K and 10-Q disclose the most significant matters that make an investment in Alkermes risky.

56.    As detailed herein, during the Class Period, Alkermes' Forms 10-K and 10-Q made materially false and misleading representations about the Company's marketing efforts of Vivitrol, which the Company touted as key to its ongoing success, without disclosing that the Company had engaged in deceptive marketing practices during the Class Period.

---

[2]    All emphasis in bold and italics is added throughout, unless otherwise noted.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
MADE DURING THE CLASS PERIOD**

57.    The Class Period begins on February 24, 2015.  On that day, Alkermes filed an

Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results

for the quarter and year ended December 31, 2014 (the "2014 10-K").  For 2014, total revenues were

$618.8 million, with $94.2 million, or 15.22%, coming from sales of Vivitrol.

58.    With regard to Vivitrol, the 2014 10-K stated, in relevant part:

> We are responsible for the marketing of VIVITROL in the U.S.  We focus our sales
> and marketing efforts on specialist physicians in private practice and in public
> treatment systems.  ***We use customary pharmaceutical company practices to market
> our product*** and to educate physicians, such as sales representatives calling on
> individual physicians, advertisements, professional symposia, selling initiatives,
> public relations and other methods.  We provide, or contract with third- party
> vendors to provide, customer service and other related programs for our product,
> such as product-specific websites, insurance research services and order, delivery and
> fulfillment services.  Our sales force for VIVITROL in the U.S. consists of
> approximately 70 individuals.  VIVITROL is sold directly to pharmaceutical
> wholesalers, specialty pharmacies and a specialty distributor.  Product sales of
> VIVITROL during the year ended December 31, 2014 to CVS Caremark Corporation
> and McKesson Corporation represented approximately 17% and 15%, respectively,
> of total VIVITROL sales.

59.    The statement that "[w]e use customary pharmaceutical company practices to market

our product . . ." referenced in ¶58 was materially false and misleading because Defendants knew, or

recklessly disregarded, that:

(a)    the Company's growth through sales of Vivitrol were being driven by

deceptive marketing campaigns to influence policymakers to use Vivitrol over other more affordable

and efficacious treatment options by falsely claiming that Vivitrol was the only non-addictive opioid

treatment that would prevent opioid users from relapsing;

(b)    the foregoing conduct, when disclosed, would foreseeably subject Alkermes to

heightened regulatory and legislative scrutiny;

- 15 -

(c)      accordingly, the Company's revenues derived from sales of Vivitrol through these channels were unsustainable; and

(d)      as a result of the foregoing, Alkermes shares traded at artificially inflated prices during the Class Period.

60.      On April 30, 2015, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended March 31, 2015.

61.      On July 30, 2015, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended June 30, 2015.

62.      On October 29, 2015, Alkermes issued a press release reporting its financial results for the three months ended September 30, 2015 ("3Q15").  The Company reported that net sales of Vivitrol for the quarter were $37.9 million, an increase of 47% over the same period in the prior year.  The press release further stated, in pertinent part, as follows:

> "We are pleased by our solid financial performance during the third quarter and are on track with our financial expectations for the remainder of 2015.  The approval of ARISTADA further strengthens our commercial portfolio and represents a major financial opportunity for Alkermes," commented James Frates, Chief Financial Officer of Alkermes.  "***Heading into 2016, we are well-positioned to*** invest in our development plans for our late-stage pipeline, the launch of ARISTADA and ***drive the growth of VIVITROL®.***"

63.      That same day, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended September 30, 2015.

64.     The statement that "[h]eading into 2016, we are well-positioned to . . . drive the growth of Vivitrol" referenced above in ¶62 was materially false and misleading for the reasons set forth above in ¶59.

65.     On January 12, 2016, Alkermes made a corporate presentation at the 34th Annual J.P. Morgan Healthcare Conference at the Westin St. Francis Hotel in San Francisco.  During his presentation, defendant Pops misleadingly distinguished Vivitrol from its competitors as being the treatment that will enable opioid addicts to live a drug-free life:

> So, [Vivitrol] is for that group of patients who don't want to be addicted to opioid anymore, don't want to be drug users.  So, it's not all patients, but it's for those patients ***who want to live a drug-free life***.

66.     The statement that "[Vivitrol is] for those patients who want to live a drug-free life" referenced above in ¶65 was materially false and misleading because Defendants knew, or recklessly disregarded, that:

(a)     the other two treatment options: (i) also enable patients to live a drug-free life; (ii) are not addictive as physicians have had success with using these treatments in a manner that allows those patients to eventually taper off the treatments; and (iii) are not intended to be lifelong treatments;

(b)     not a single study had been completed comparing the efficacy of Vivitrol with that of the other two treatment options;

(c)     the foregoing information, when learned about by the policymaker market solicited by Alkermes, would foreseeably cause these entities to no longer believe that Vivitrol provided the competitive advantage misleadingly touted by Defendants; and

(d)     as a result of the foregoing, Alkermes shares traded at artificially inflated prices during the Class Period.

67.    On February 25, 2016, Alkermes issued a press release announcing its financial results for the three months ended December 31, 2015 ("4Q15"), as well as, the twelve months ended December 31, 2015 ("FY15").  The Company reported that net sales of Vivitrol for the quarter were $38.2 million, an increase of 29% over the same period in the prior year, while net sales for the full year were $144 million, an increase of 53% over the prior year.  The press release further stated, in pertinent part, as follows:

> Our financial results in 2015 were driven by the strong performance of VIVITROL, the approval and launch of ARISTADA into a rapidly growing long-acting antipsychotic market, and the continued strength of our base business," commented James Frates, Chief Financial Officer of Alkermes.  ***In 2016, we expect our business to continue to grow, led by VIVITROL and ARISTADA.***  Together with our solid royalty and manufacturing base business, these proprietary products are expected to drive revenue growth of 15 to 20 percent."

68.    That same day, Alkermes filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For 2015, total revenues were $628.3 million, with $144.4 million, or 22.98%, coming from sales of Vivitrol.

69.    With regard to Vivitrol, the 2015 10-K stated, in relevant part:

> We are responsible for the marketing of VIVITROL and ARISTADA in the U.S. We focus our sales and marketing efforts on specialist physicians in private practice and in public treatment systems.  ***We use customary pharmaceutical company practices to market our product*** and to educate physicians, such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives, public relations and other methods.  We provide, or contract with third-party vendors to provide, customer service and other related programs for our products, such as product-specific websites, insurance research services and order, delivery and fulfillment services.

> Our sales force for VIVITROL in the U.S. consists of approximately 70 individuals. VIVITROL is sold directly to pharmaceutical wholesalers, specialty pharmacies and a specialty distributor.  Product sales of VIVITROL during the year ended December 31, 2015 to McKesson Corporation, CVS Caremark Corporation and Cardinal Health represented approximately 17%, 15% and 10%, respectively, of total VIVITROL sales.

70.      The statements that "[i]n 2016, we expect our business to continue to grow, led by Vivitrol . . ." referenced above in ¶67 and that "[w]e use customary pharmaceutical company practices to market our product . . ." referenced above in ¶69 were materially false and misleading for the reasons set forth above in ¶59.

71.      On March 8, 2016, Alkermes made a corporate presentation at the Cowen and Company 36th Annual Health Care Conference in Boston.  In his presentation, defendant Frates distinguished Vivitrol from the other available treatment medications, stating:

> So, we have someone addicted to opiates, and we move them and transition them onto a different opiate.  And we keep them addicted, but in a safer, more controlled way, under the care of a physician.  No doubt that's an important step forward.  ***But the idea of actually moving those patients and giving them an opportunity to get to a drug-free life, to get to abstinence – that's what our drug does***.

72.      The statement that "giving [patients] an opportunity to get to a drug-free life, to get to abstinence – that's what our drug does" referenced above in ¶71 was materially false and misleading for the reasons set forth above in ¶66.

73.      On April 28, 2016, Alkermes issued a press release reporting its financial results for the three months ended March 31, 2016 ("1Q16").  The Company reported that net sales of Vivitrol for the quarter were $ 43.8 million, an increase of 41% over the same period in the prior year.  The press release further stated, in pertinent part, as follows:

> "***Our solid first quarter performance was highlighted by the robust growth in VIVITROL® sales***, the launch of ARISTADA®, and continued strength of our base royalty and manufacturing business.  The launch of ARISTADA continues to gain traction, and we are pleased with the progress that we are making with reimbursement discussions and physician awareness," commented James Frates, Chief Financial Officer of Alkermes.   "With our strong financial position and growing commercial portfolio, we are well positioned to invest in our advancing pipeline, and today we are reiterating our financial expectations for 2016."
>
> "We have built a differentiated and resilient business.  ***Our portfolio of innovative products, including VIVITROL and ARISTADA, is growing rapidly and represents a significant opportunity in the years ahead***," said Richard Pops, Chief Executive Officer of Alkermes.  "Our pipeline has a number of exciting late-stage programs,

and we are on the threshold of numerous development milestones.  With three drug candidates in pivotal studies, each representing an important and differentiated treatment option in its therapeutic space, and two new candidates beginning clinical studies, the medical importance and potential economic value of our pipeline is substantial and growing."

74.     That same day Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended March 31, 2016.

75.     The statements that "[o]ur solid first quarter performance was highlighted by the robust growth in Vivitrol sales. . ." and that "Vivitrol . . . is growing rapidly and represents a significant opportunity in the years ahead" referenced above in ¶73 were materially false and misleading for the reasons set forth above in ¶59.

76.     On July 28, 2016, Alkermes issued a press release announcing its financial results for the three months ended June 30, 2016 ("2Q16").  The Company reported that net sales of Vivitrol for the quarter were $47.2 million, an increase of 27% over the same period in the prior year.  The press release further stated, in pertinent part, as follows:

> "*Our proprietary commercial products, VIVITROL and ARISTADA, represent important growth opportunities at a time when substance abuse and mental illness are significant public health priorities*," said Richard Pops, Chief Executive Officer of Alkermes.  "*Against this backdrop, we continue to make important advances for VIVITROL and are just beginning to see what its ultimate potential may be*.

77.     That same day the Company filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended June 30, 2016.

78.     The statements referenced above in ¶76 were materially false and misleading for the reasons set forth above in ¶59.

79.     On November 2, 2016, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended September 30, 2016.

80.     On November 16, 2016, Alkermes presented at the Jefferies 2016 London Healthcare Conference in London, England.  In the presentation, defendant Pops touted Vivitrol as the "first and only non-narcotic, **non-addictive** medication for the treatment of opioid dependence."

81.     The statement referenced above in ¶80 was materially false and misleading for the reasons set forth above in ¶66.

82.     At the November 16, 2016 conference, defendant Pops further stated that Vivitrol users "***are not going to relapse to opioid dependence***."

83.     The statement that referenced above in ¶82 was materially false and misleading because Defendants knew, or recklessly disregarded, that:

(a)     one study relied upon for FDA approval of Vivitrol found, in a comparison of Vivitrol to a placebo, that nearly half of those patients who received Vivitrol failed to stay abstinent over a six-month period, meaning that taking Vivitrol does not mean that patients are not going to relapse to opioid dependence;

(b)     the foregoing information, when learned about by the policymaker market solicited by Alkermes, would foreseeably cause these entities to no longer believe that Vivitrol provided the competitive advantage misleadingly touted by Defendants; and

(c)     as a result of the foregoing, Alkermes shares traded at artificially inflated prices during the Class Period.

84.     On February 15, 2017, Alkermes issued a press release announcing its financial results for the three months ended December 31, 2016 ("4Q16"), as well as, the twelve months

ended December 31, 2016 ("FY16").  The Company reported that net sales of Vivitrol for the quarter were $62.1 million, an increase of 67% over the same period in the prior year, and net sales for the year were $209 million, an increase of 45% over the prior year.  The press release further stated, in pertinent part, as follows:

> "We have built Alkermes to thrive in an increasingly challenging biopharmaceutical industry.  Our base business of FDA-approved medicines is significant and growing, led by VIVITROL and ARISTADA.  We have identified our next phase of growth based on a remarkable, late-stage, phase 3 portfolio.  Our focus on large, chronic diseases of the CNS coupled with our approach to selecting, developing, and commercializing medicines is unique and built for a complex public health environment," said Richard Pops, Chief Executive Officer of Alkermes.  "2017 will bring an unprecedented level of activity across all of the major areas of Alkermes. ***Our proprietary commercial products, VIVITROL and ARISTADA, will continue their growth as we bring new and distinctive features to patients and providers***.

85.     On February 17, 2017, Alkermes filed an Annual Report on Form 10-K with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the year ended December 31, 2016 (the "2016 10-K"). For 2016, total revenues were $745.7 million, with $209.0 million, or 28.02%, coming from sales of Vivitrol.

86.     With regard to Vivitrol, the 2016 10-K stated, in relevant part:

> We are responsible for the marketing of VIVITROL and ARISTADA in the U.S. We focus our sales and marketing efforts on specialist physicians in private practice and in public treatment systems.  ***We use customary pharmaceutical company practices to market our product*** and to educate physicians, such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives and other methods.  We provide, or contract with third-party vendors to provide, customer service and other related programs for our products, such as product-specific websites, insurance research services and order, delivery and fulfillment services.
>
> Our sales force for VIVITROL in the U.S. consists of approximately 90 individuals. VIVITROL is sold directly to pharmaceutical wholesalers, specialty pharmacies and a specialty distributor.  Product sales of VIVITROL during the year ended December 31, 2016 to AmerisourceBergen Corporation ("AmerisourceBergen"), McKesson Corporation, Cardinal Health and CVS Caremark Corporation represented approximately 19%, 18%, 13% and 12%, respectively, of total VIVITROL sales.

87.     The statements that "[o]ur proprietary commercial products, VIVITROL and ARISTADA, will continue their growth. . ." referenced above in ¶84 and that "[w]e use customary pharmaceutical company practices to market our product . . ." referenced above in ¶86were materially false and misleading for the reasons set forth above in ¶59.

88.     On March 7, 2017, Alkermes made a corporate presentation at the Cowen and Company 37th Annual Health Care Conference at The Boston Marriott Copley Place in Boston.  In his presentation, defendant Pops stated, in pertinent part:

> So, Vivitrol also is a unique medicine.  And starting on the far left, the indication, it is the only drug -- the FDA label says it is approved, indicated for preventing relapse to opioid dependence.  That's a remarkable statement for a clinician and for a patient. ***If you take this medicine each month, you will not relapse to opioid dependence***.

89.     The statement "[i]f you take this medicine each month, you will not relapse to opioid dependence" referenced above in ¶88 was materially false and misleading for the reasons set forth above in ¶83.

90.     On April 27, 2017, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended March 31, 2017.

91.     On July 27, 2017, Alkermes issued a press release announcing its financial results for the three months ended June 30, 2017 ("2Q17").  The Company reported that net sales of Vivitrol for the quarter were $66.1 million, an increase of 40% over the same period in the prior year.  The press release further stated, in pertinent part, as follows:

> "Our solid results this quarter demonstrate the continued strength of our business and commercial portfolio, ***driven by increasing demand for our proprietary products, VIVITROL® and ARISTADA®, which continue to grow robustly in their respective markets***," commented James Frates, Chief Financial Officer of Alkermes.  "The financial underpinnings of our business are strong for today and into the future, as we focus on growing our commercial portfolio and the clinical development of our pipeline candidates.  Today, we are reiterating our financial expectations for 2017 that we provided in February."

92.     That same day, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended June 30, 2017.

93.     The statement that Vivitrol continues to grow robustly in its market referenced above in ¶91 was materially false and misleading for the reasons set forth above in ¶59.

94.     On October 26, 2017, Alkermes filed a quarterly report on Form 10-Q with the SEC, which was signed and certified pursuant to SOX by the Individual Defendants, reporting the Company's financial and operating results for the quarter ended September 30, 2017.

**Alkermes' Deceptive Practices Are Revealed**

95.     On Sunday, June 11, 2017, *The New York Times* published an article entitled "Seizing On Opioid Crisis, a Drug Maker Lobbies Hard for its Product."  The article described Alkermes' aggressive efforts to market Vivitrol, while disparaging the efficacy of other addiction treatments, stating, in part:

> Five years ago, Vivitrol was a treatment for opioid addiction that was struggling to find a market.  Now, its sales and profile are rising fast, thanks to its manufacturers' shrewd use of political connections, and ***despite scant science to prove the drug's efficacy.***

> Last month, the health and human services secretary, Tom Price, praised it as the future of opioid addiction treatment after visiting the company's plant in Ohio.  He set off a furor among substance abuse specialists by criticizing its less expensive and more widely used and rigorously studied competitors, buprenorphine and methadone, as medications that "simply substitute" for illicit drugs.

> It was the kind of plug that Vivitrol's maker, Alkermes, has spent years coaxing, with a deft lobbying strategy that has targeted lawmakers and law enforcement officials.  ***The company has spent millions of dollars on contributions to officials struggling to stem the epidemic of opioid abuse.  It has also provided thousands of free doses to encourage the use of Vivitrol in jails and prisons, which have by default become major detox centers.***

> *             *             *

The company's strategy highlights the profit opportunities that drug companies and investors see in an opioid epidemic that killed 91 Americans every day in 2015 and is growing worse.  But **some of its marketing tactics**, and Mr. Price's comments, **ignore widely accepted science**, as nearly 700 experts in the field wrote the health secretary in a letter.

**Not a single study has been completed comparing Vivitrol with its less expensive competitors.**  Some studies have shown high dropout rates, or found that many participants returned to opioid use while taking Vivitrol or after going off it.  **In one study that the company used to secure the Food and Drug Administration's approval of Vivitrol for opioid addiction treatment, conducted with 250 patients in Russia, nearly half of those who got Vivitrol failed to stay abstinent over a six-month period, although they stayed abstinent and in treatment longer than those who got a placebo.**

*     *     *

"If you care about actually solving the problem, you cannot stigmatize the most effective treatments," said Dr. Joshua Sharfstein, a former Maryland health secretary who is now an associate dean at the Johns Hopkins Bloomberg School of Public Health.  "**This is a company that has put its own perverted idea of market success ahead of actually solving the problem**."

As health secretary, he said, he had to call a meeting to tell Alkermes to "back off talking down methadone and buprenorphine" to legislators as the company aggressively lobbied to get Maryland to use Vivitrol.

"They're exploiting a stigma that exists out of a very narrow view of their own economic self-interest," he said.  "And the result is going to be more people dying if they cannot get access to effective treatment."

96.      The next morning, on June 12, 2017, NPR published an article entitled "A Drugmaker Tries To Cash In On The Opioid Epidemic, One State Law At A Time."  The article discusses the Company's unethical lobbying tactics to push for state legislatures to enact laws making it more difficult to obtain methadone or  buprenorphine.  The article stated, in pertinent part, that:

An investigation by NPR and Side Effects Public Media has found that in statehouses across the country, and in Congress, Alkermes is pushing Vivitrol while contributing to misconceptions and stigma about other medications used to treat opioid addiction.

While policymakers are grasping for solutions to the nation's opioid epidemic, **Alkermes**, which has its U.S. headquarters in Waltham, Mass., **is using policy to promote its drug and, in some cases, hamper access to medications that can help.**  And in so doing, it's looking to turn its drug into a blockbuster.

*      *      *

Leading up to the passage of the Comprehensive Addiction and Recovery Act in 2016, the company sought increased federal regulation of buprenorphine. *"**This is one of the most intense behind-the-scenes lobbying efforts,**"* said a Democratic congressional staffer, who was not authorized to speak on the record. "It frustrated me to no end for 2 1/2, three years."

*[**Alkermes] circulated a document**, obtained by NPR and Side Effects, **that presented slanted material about buprenorphine, focused on the drug's potential for diversion and abuse while largely ignoring its benefits for individuals and for public health. "This is basically a very long attempt to bash buprenorphine[.]"** . . .* As lawmakers sought to expand access to treatment, the white paper called for stricter regulation of buprenorphine through a bill dubbed the Opioid Addiction Treatment Modernization Act, introduced in the House in June 2015. *"**The legislation they wanted introduced was actually going the other direction, in terms of making it more onerous to be a doctor wanting to prescribe these medications, and would have hurt treatment capacity in this country,**"* says the staffer.

97.     The article also described how Alkermes aggressively pushed state legislators, judges, and prison officials to promote a "goal of opioid abstinence" when science-based evidence shows that opioid treatment plans are not one-size-fits-all, simply in an effort to drive up its sales since Alkermes is the only opioid-free medication.

98.     Further, the article describes how Alkermes promoted Vivitrol as the non-addictive treatment option when, in reality, it is the only non-dependent treatment option: "Some doctors compare being dependent on buprenorphine to the dependency someone with diabetes has on insulin: It's simply a medication needed to help manage a chronic condition." According to the article, the Company further falsely and misleadingly disparages its competitors by describing Vivitrol as the only non-addictive treatment because calling it the only non-addictive treatment option implies that the other treatment options "are super addictive, *even though for most people, they're helpful and not abused.*"

99.     The next day, on June 13, 2017, *The Fix*, an online addiction and recovery website, published an article entitled "Maker of Vivitrol Lobbies to Influence Legislation on Medication-

Assisted Treatment." The article described how Defendants are "pushing hard to smother treatment options like Suboxone and methadone to make way for Vivitrol's rise" and that Alkermes has "[a]larmingly . . . worked its way directly into laws regulating medication-assisted treatment and responses to the opioid epidemic."

100. *The Fix* further highlighted Alkermes' deceptive marketing and lobbying efforts, including stigmatizing those who use methadone and buprenorphine to combat the horrific disease:

> Lobbyists for Alkermes have leveraged this skepticism to promote their own product. "In a number of states, there has been a significant push by Alkermes and their lobbyists to really squelch other treatment, so that they can get access to bigger markets for their drug[.]"

101. The article on *The Fix* also noted that Vivitrol cannot properly be compared to methadone or buprenorphine because methadone and buprenorphine are not truly competitors of Vivitrol:

> Dr. Andy Chambers, an addiction psychiatrist in Indianapolis, said Alkermes acts as if methadone and buprenorphine are competitors, when the drugs are meant for different types of patients. "That's really an unfortunate dynamic," he says. "They're not designed to do the same thing. It's like comparing apples and oranges."

102. Then, on June 29, 2017, STAT, an online life sciences news website, published an article entitled "Vivitrol Offers the Fantasy of Being Drug-Free. But That's Not the Most Important Thing in Tackling Addiction." First, the article calls into question the Alkermes study conducted in Russia, noting that Vivitrol is clearly not the miracle drug Defendants make it out to be:

> Alkermes did conduct a single clinical trial to demonstrate the efficacy of Vivitrol for heroin addiction and secure its approval from the Food and Drug Administration. But the company did it in Russia, which bans both methadone and buprenorphine. ***Even there, where treatment options are severely limited, expensive, and abusive, nearly half the people in the trial who were getting free Vivitrol dropped out.***

103. The article also criticized Alkermes for lobbying to make Vivitrol the only treatment option available in drug courts:

For anyone who has seen the suffering caused by opioids, blocking them out - in the body, or in our society - is a powerful impulse.  But when we allow it to deprive patients of options or to blind us to the realities of drugs and effective treatment, it begs the question of how high a price we are willing to pay for a drug-free fantasy.

And a fantasy it is.  ***Vivitrol patients, who require a monthly injection, are not drug-free***, and the medication's price tag is many times that of methadone and buprenorphine.

Far more important, patients pay a terrible cost including, in some instances, their lives, when we allow criminal justice officials or health providers who have internalized the thinking of drug control to predetermine what treatments work.  Anyone who insists that there is only one acceptable approach to treating drug dependence is motivated more by ideology than evidence.

104.    On July 27, 2017, the Company disclosed that, on June 22, 2017, it had received a subpoena from an Office of the U.S. Attorney for documents related to Vivitrol.

105.    Additional investigative articles published by NPR reveal Defendants' unusual and deceptive sales practices of marketing Vivitrol to judges and prison officials, instead of the more widely-accepted practice of educating medical professionals.  On August 3, 2017, NPR published an article entitled "To Grow Market Share, A Drugmaker Pitches Its Product to Judges."  The article describes how Alkermes, through the courts, forced Vivitrol on patients that might be more successful pursuing other treatment options.  The article stated, in pertinent part, as follows:

***While it's effective in some people, it's not for everyone***.  Patients have to be ready to be opioid-free, and some patients won't do well on it.  It can also have side effects, which Kirby says he experienced.

"I had sinus problems, chest problems for the whole month I was on it," Kirby says. "I couldn't shake it."

He says he also got a rash – another possible reaction to Vivitrol, according to the product's warnings.  Months after he had the shot, he still had white splotches on his arms, which he attributed to the drug.  ***But even with those symptoms, Kirby says the court urged him to stick with the medication for a couple of more months.  "They were way too pushy about it," he says.***

106.    The article also discusses how Defendants are manipulating the market by marketing Vivitrol directly to drug court judges and other officials:

The strategy capitalizes on a market primed to prefer their product.  Judges, prosecutors and other criminal justice officials can be suspicious of the other FDA-approved addiction medications, buprenorphine and methadone, because they are themselves opioids.  Alkermes promotes its product as "nonaddictive."

\*   \*   \*

Many treatment specialists say allowing judges and other criminal justice officials with no medical training to exert influence over medical decisions is problematic. The power makes them prime targets for Vivitrol marketing, they say.

107.    Finally, the article also discusses how many drug courts offer those facing criminal charges the option of either taking Vivitrol or facing jail time:

But facing potential jail time and court officials who really believe in Vivitrol, participants say getting the shot doesn't always feel like a choice.  "They made it seem like they were forcing it upon me, like I couldn't come into the program until I got it," Kirby says.

108.    Finally, on November 6, 2017, U.S. Senator Kamala Harris announced the opening of an investigation into Alkermes' sales practices for Vivitrol.  Senator Harris specifically stated that the Company "aggressively marketed" its medication, convincing judges and prison officials to use it rather than more proven addiction-treatment products, and spent hundreds of thousands of dollars lobbying policymakers.

109.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

110.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading.  The Individual Defendants knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

111.    By virtue of their receipt of information reflecting the true facts regarding Alkermes' operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Alkermes, the Individual Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

112.    Several facts support a strong inference of the Individual Defendants' scienter during the Class Period, including: (a) insider stock sales; and (b) the misstatements and omissions of material facts concern the Company's core operations, about which the Individual Defendants were repeatedly questioned and spoke.

113.    Likewise, the fraud alleged herein relates to the core business and operations of Alkermes so knowledge of the fraud may be imputed to Defendants. Given Defendants' knowledge of the truth concerning the Company's deceptive marketing practices and the limitations of Vivitrol's efficacy, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.

114.    Additionally, Defendants were motivated to engage in their fraudulent course of conduct in order to allow high-level Alkermes officers and directors, including the Individual Defendants, to sell shares of their personally-held Alkermes common stock at inflated prices, which yielded them gross proceeds of over $102 million during the Class Period, as follows:

| Name | Title | Date | No. of Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Biberstein, Kathryn L. | Officer | 01-Dec-2016 | 7,067 | 56.63 | $400,204 |
| | | 01-Dec-2016 | 7,933 | 55.69 | $441,789 |
| | | 06-Dec-2016 | 5,000 | 56.24 | $281,200 |
| | | 07-Dec-2016 | 4,100 | 56.50 | $231,650 |
| | | 07-Dec-2016 | 900 | 57.11 | $51,399 |
| | | 08-Dec-2016 | 4,145 | 55.42 | $229,716 |
| | | 03-Apr-2017 | 3,763 | 58.35 | $219,571 |
| | | 03-Apr-2017 | 300 | 59.13 | $17,739 |
| | | 03-Apr-2017 | 10,937 | 57.41 | $627,893 |
| | | 11-Sep-2017 | 11,067 | 51.18 | $566,409 |
| | | 11-Sep-2017 | 2,499 | 51.77 | $129,373 |
| | | | **57,711** | | **$3,196,943** |
| | | | | | |
| Breyer, Robert A. | Director | 01-Apr-2015 | 5,000 | 61.22 | $306,100 |
| | | 04-May-2015 | 2,000 | 60.00 | $120,000 |
| | | 01-Jun-2015 | 2,000 | 60.78 | $121,560 |
| | | 01-Jul-2015 | 2,000 | 64.90 | $129,800 |
| | | 03-Aug-2015 | 2,000 | 69.61 | $139,220 |
| | | 01-Sep-2015 | 2,000 | 61.43 | $122,860 |
| | | 01-Oct-2015 | 516 | 60.00 | $30,960 |
| | | 02-Oct-2015 | 1,484 | 60.00 | $89,040 |
| | | 02-Nov-2015 | 2,000 | 71.80 | $143,600 |
| | | 01-Dec-2015 | 2,000 | 73.46 | $146,920 |
| | | 04-Jan-2016 | 2,000 | 77.33 | $154,660 |
| | | 10-Nov-2016 | 20,000 | 60.00 | $1,200,000 |
| | | 04-Jan-2017 | 4,000 | 60.00 | $240,000 |
| | | 02-Mar-2017 | 4,000 | 60.00 | $240,000 |
| | | | **51,000** | | **$3,184,720** |
| | | | | | |
| Brown, Iain Michael | Officer | 29-Oct-2015 | 10,822 | 69.99 | $757,432 |
| | | 18-Apr-2016 | 5,368 | 39.27 | $210,801 |
| | | 06-Sep-2016 | 3,469 | 46.36 | $160,823 |
| | | 06-Sep-2016 | 26,507 | 45.87 | $1,215,876 |
| | | | **46,166** | | **$2,344,932** |
| | | | | | |
| Cooke, Shane M. | President | 23-Mar-2015 | 4,700 | 65.87 | $309,589 |
| | | 23-Mar-2015 | 13,300 | 65.14 | $866,362 |
| | | 23-Apr-2015 | 18,000 | 62.55 | $1,125,900 |
| | | 26-May-2015 | 17,300 | 60.29 | $1,043,017 |
| | | 26-May-2015 | 700 | 60.81 | $42,567 |
| | | 23-Jun-2015 | 17,100 | 66.80 | $1,142,280 |
| | | 23-Jun-2015 | 900 | 67.56 | $60,804 |
| | | 23-Jul-2015 | 2,401 | 70.40 | $169,030 |
| | | 23-Jul-2015 | 15,599 | 69.70 | $1,087,250 |
| | | 24-Aug-2015 | 1,000 | 53.40 | $53,400 |
| | | 24-Aug-2015 | 1,200 | 54.65 | $65,580 |
| | | 24-Aug-2015 | 5,661 | 57.78 | $327,093 |

|  |  | 24-Aug-2015 | 5,107 | 58.64 | $299,474 |
|  |  | 24-Aug-2015 | 2,500 | 56.67 | $141,675 |
|  |  | 24-Aug-2015 | 2,532 | 59.41 | $150,426 |
|  |  | 23-Sep-2015 | 13,900 | 67.29 | $935,331 |
|  |  | 23-Sep-2015 | 4,100 | 66.41 | $272,281 |
|  |  | 23-Oct-2015 | 7,926 | 61.59 | $488,162 |
|  |  | 23-Oct-2015 | 10,074 | 62.38 | $628,416 |
|  |  | 23-Nov-2015 | 17,100 | 72.59 | $1,241,289 |
|  |  | 23-Nov-2015 | 900 | 73.07 | $65,763 |
|  |  | 23-Dec-2015 | 8,500 | 76.73 | $652,205 |
|  |  | 23-Dec-2015 | 9,500 | 77.67 | $737,865 |
|  |  | 04-Jan-2017 | 2,543 | 60.01 | $152,605 |
|  |  | 05-Jan-2017 | 300 | 60.10 | $18,030 |
|  |  | 06-Jan-2017 | 6,607 | 60.07 | $396,882 |
|  |  | 09-Jan-2017 | 550 | 60.27 | $33,149 |
|  |  | 02-Mar-2017 | 20,000 | 60.00 | $1,200,000 |
|  |  | 20-Mar-2017 | 300 | 60.00 | $18,000 |
|  |  | 21-Mar-2017 | 1,600 | 60.10 | $96,160 |
|  |  | 23-Mar-2017 | 6,030 | 60.01 | $361,860 |
|  |  | 29-Mar-2017 | 2,070 | 60.00 | $124,200 |
|  |  | 01-May-2017 | 3,500 | 60.05 | $210,175 |
|  |  | 04-May-2017 | 6,500 | 60.05 | $390,325 |
|  |  | 08-Jun-2017 | 10,000 | 60.33 | $603,300 |
|  |  | | **240,000** | | **$15,510,447** |
| Ehrich, Elliot W. | Officer | 16-Mar-2015 | 18,000 | 66.81 | $1,202,580 |
|  |  | 21-Apr-2015 | 10,228 | 61.99 | $634,034 |
|  |  | 21-Apr-2015 | 14,772 | 62.66 | $925,614 |
|  |  | 13-Apr-2016 | 500 | 38.44 | $19,220 |
|  |  | 13-Apr-2016 | 11,198 | 37.63 | $421,381 |
|  |  | 26-Jul-2016 | 800 | 51.82 | $41,456 |
|  |  | 27-Jul-2016 | 34,399 | 51.95 | $1,787,028 |
|  |  | 06-Sep-2016 | 7,500 | 45.93 | $344,475 |
|  |  | 06-Sep-2016 | 2,500 | 46.31 | $115,775 |
|  |  | 16-Sep-2016 | 5,000 | 48.87 | $244,350 |
|  |  | 21-Sep-2016 | 1,166 | 50.81 | $59,244 |
|  |  | 22-Sep-2016 | 3,834 | 50.84 | $194,921 |
|  |  | 12-Dec-2016 | 16,983 | 55.15 | $936,612 |
|  |  | 15-Dec-2016 | 5,000 | 55.99 | $279,950 |
|  |  | 04-Jan-2017 | 2,500 | 60.01 | $150,025 |
|  |  | 04-Jan-2017 | 5,000 | 58.83 | $294,150 |
|  |  | 05-Jan-2017 | 400 | 60.08 | $24,032 |
|  |  | 06-Jan-2017 | 2,100 | 60.12 | $126,252 |
|  |  | 17-Jan-2017 | 11,983 | 54.32 | $650,917 |
|  |  | 15-Feb-2017 | 1,000 | 58.17 | $58,170 |
|  |  | 16-Feb-2017 | 3,915 | 56.05 | $219,436 |
|  |  | 16-Feb-2017 | 6,085 | 56.84 | $345,871 |
|  |  | 15-Mar-2017 | 6,900 | 57.00 | $393,300 |

| | | | | | |
|---|---|---|---|---|---|
| | | 15-Mar-2017 | 4,100 | 56.29 | $230,789 |
| | | 17-Apr-2017 | 10,000 | 56.60 | $566,000 |
| | | | **185,863** | | **$10,265,581** |
| Defendant Frates, James M. | Chief Financial Officer | 10-Mar-2015 | 8,600 | 66.15 | $568,890 |
| | | 10-Mar-2015 | 1,400 | 66.87 | $93,618 |
| | | 15-Apr-2015 | 10,000 | 62.42 | $624,200 |
| | | 12-May-2015 | 10,000 | 59.34 | $593,400 |
| | | 16-Jun-2015 | 10,000 | 58.63 | $586,300 |
| | | 14-Jul-2015 | 8,485 | 66.37 | $563,149 |
| | | 14-Jul-2015 | 11,515 | 65.37 | $752,736 |
| | | 11-Aug-2015 | 6,926 | 68.13 | $471,868 |
| | | 11-Aug-2015 | 3,074 | 67.63 | $207,895 |
| | | 15-Sep-2015 | 10,800 | 70.85 | $765,180 |
| | | 15-Sep-2015 | 9,200 | 71.39 | $656,788 |
| | | 13-Oct-2015 | 4,346 | 60.72 | $263,889 |
| | | 13-Oct-2015 | 5,949 | 60.20 | $358,130 |
| | | 13-Oct-2015 | 9,705 | 59.09 | $573,468 |
| | | 10-Nov-2015 | 10,000 | 72.34 | $723,400 |
| | | 07-Dec-2016 | 856 | 57.22 | $48,980 |
| | | 07-Dec-2016 | 5,496 | 55.65 | $305,852 |
| | | 07-Dec-2016 | 17,379 | 56.44 | $980,871 |
| | | 14-Dec-2016 | 24,900 | 54.72 | $1,362,528 |
| | | 14-Dec-2016 | 100 | 55.20 | $5,520 |
| | | 07-Mar-2017 | 24,600 | 59.07 | $1,453,122 |
| | | 07-Mar-2017 | 400 | 59.57 | $23,828 |
| | | | **193,731** | | **$11,983,613** |
| Gaffin, David Joseph | Officer | 06-Sep-2016 | 2,382 | 45.92 | $109,381 |
| | | 03-Jan-2017 | 2,500 | 55.40 | $138,500 |
| | | | **4,882** | | **$247,881** |
| Landine, Michael J. | Officer | 10-Sep-2015 | 4,300 | 68.06 | $292,658 |
| | | 10-Sep-2015 | 5,700 | 67.26 | $383,382 |
| | | 17-Sep-2015 | 6,206 | 70.92 | $440,130 |
| | | 17-Sep-2015 | 3,794 | 71.65 | $271,840 |
| | | 01-Dec-2015 | 302 | 73.55 | $22,212 |
| | | 01-Dec-2015 | 1,400 | 73.11 | $102,354 |
| | | 01-Dec-2015 | 8,298 | 71.97 | $597,207 |
| | | 07-Dec-2015 | 1,000 | 73.71 | $73,710 |
| | | 07-Dec-2015 | 2,750 | 72.77 | $200,118 |
| | | 20-Apr-2016 | 9,993 | 40.97 | $409,413 |
| | | 20-Apr-2016 | 6,882 | 41.26 | $283,951 |
| | | 09-Nov-2016 | 2,870 | 56.89 | $163,274 |
| | | 09-Nov-2016 | 2,000 | 55.19 | $110,380 |
| | | 09-Nov-2016 | 5,130 | 56.24 | $288,511 |
| | | 16-Nov-2016 | 9,600 | 58.57 | $562,272 |
| | | 16-Nov-2016 | 400 | 59.12 | $23,648 |

| | | | | | |
|---|---|---|---|---|---|
| | | 30-Nov-2016 | 1,500 | 58.51 | $87,765 |
| | | 30-Nov-2016 | 8,500 | 57.33 | $487,305 |
| | | 11-May-2017 | 10,000 | 57.01 | $570,100 |
| | | 18-May-2017 | 1,300 | 57.81 | $75,153 |
| | | 18-May-2017 | 8,700 | 57.14 | $497,118 |
| | | 01-Nov-2017 | 15,000 | 48.71 | $730,650 |
| | | | **115,625** | | **$6,673,151** |
| Mitchell, Paul J. | Director | 15-Apr-2015 | 1,500 | 62.71 | $94,065 |
| | | 01-May-2015 | 1,500 | 55.79 | $83,685 |
| | | 01-Jun-2015 | 1,500 | 60.78 | $91,170 |
| | | 17-Jun-2015 | 15,500 | 65.10 | $1,009,050 |
| | | 04-Jan-2016 | 2,000 | 77.33 | $154,660 |
| | | 04-Feb-2016 | 2,000 | 32.81 | $65,620 |
| | | 04-Mar-2016 | 2,000 | 32.80 | $65,600 |
| | | 04-Apr-2016 | 2,000 | 35.65 | $71,300 |
| | | 04-May-2016 | 2,000 | 38.60 | $77,200 |
| | | 06-Jun-2016 | 2,000 | 44.98 | $89,960 |
| | | 05-Jul-2016 | 2,000 | 45.81 | $91,620 |
| | | 04-Aug-2016 | 2,000 | 49.48 | $98,960 |
| | | 06-Sep-2016 | 400 | 46.28 | $18,512 |
| | | 06-Sep-2016 | 1,600 | 45.83 | $73,328 |
| | | 04-Oct-2016 | 2,000 | 47.42 | $94,840 |
| | | 03-Jan-2017 | 1,500 | 55.40 | $83,100 |
| | | 01-Feb-2017 | 1,500 | 54.45 | $81,675 |
| | | 01-Mar-2017 | 1,500 | 57.06 | $85,590 |
| | | 03-Apr-2017 | 1,500 | 58.31 | $87,465 |
| | | 01-May-2017 | 1,500 | 58.74 | $88,110 |
| | | 01-Jun-2017 | 1,500 | 57.49 | $86,235 |
| | | 03-Jul-2017 | 1,500 | 58.11 | $87,165 |
| | | 01-Aug-2017 | 1,500 | 54.91 | $82,365 |
| | | 01-Sep-2017 | 1,500 | 50.77 | $76,155 |
| | | 02-Oct-2017 | 1,500 | 50.64 | $75,960 |
| | | 01-Nov-2017 | 1,000 | 49.16 | $49,160 |
| | | | **56,000** | | **$3,062,550** |
| Peterson, Rebecca J. | Officer | 03-Mar-2015 | 14,600 | 71.27 | $1,040,542 |
| | | 03-Mar-2015 | 775 | 72.04 | $55,831 |
| | | 05-Mar-2015 | 2,362 | 71.80 | $169,592 |
| | | 20-May-2015 | 1,050 | 62.50 | $65,625 |
| | | 20-May-2015 | 7,700 | 61.84 | $476,168 |
| | | 21-May-2015 | 16,150 | 61.53 | $993,710 |
| | | 21-May-2015 | 2,600 | 62.43 | $162,318 |
| | | 22-May-2015 | 1,058 | 61.11 | $64,654 |
| | | 26-May-2015 | 1,322 | 60.49 | $79,968 |
| | | 28-May-2015 | 200 | 60.71 | $12,142 |
| | | 28-May-2015 | 19,800 | 59.97 | $1,187,406 |
| | | 01-Jun-2015 | 1,983 | 60.78 | $120,527 |

| | | | | 69,600 | | $4,428,482 |
|---|---|---|---|---|---|---|
| Defendant Pops, Richard F. | Chief Executive Officer | 17-Sep-2015 | | 27,579 | 71.58 | $1,974,105 |
| | | 17-Sep-2015 | | 22,421 | 70.88 | $1,589,200 |
| | | 01-Dec-2015 | | 23,748 | 71.99 | $1,709,619 |
| | | 01-Dec-2015 | | 2,200 | 73.46 | $161,612 |
| | | 01-Dec-2015 | | 24,052 | 72.48 | $1,743,289 |
| | | 07-Dec-2015 | | 9,210 | 72.51 | $667,817 |
| | | 07-Dec-2015 | | 882 | 73.52 | $64,845 |
| | | 07-Dec-2015 | | 27,408 | 71.87 | $1,969,813 |
| | | 15-Mar-2016 | | 25,000 | 31.40 | $785,000 |
| | | 22-Mar-2016 | | 10,000 | 31.36 | $313,600 |
| | | 22-Mar-2016 | | 15,000 | 32.05 | $480,750 |
| | | 12-Apr-2016 | | 1,700 | 38.24 | $65,008 |
| | | 12-Apr-2016 | | 23,300 | 37.76 | $879,808 |
| | | 19-Apr-2016 | | 18,750 | 40.15 | $752,813 |
| | | 08-Nov-2016 | | 21,054 | 53.05 | $1,116,915 |
| | | 08-Nov-2016 | | 8,946 | 53.82 | $481,474 |
| | | 15-Nov-2016 | | 27,940 | 58.78 | $1,642,313 |
| | | 15-Nov-2016 | | 2,060 | 59.29 | $122,137 |
| | | 22-Nov-2016 | | 23,115 | 58.43 | $1,350,609 |
| | | 22-Nov-2016 | | 6,885 | 59.44 | $409,244 |
| | | 29-Nov-2016 | | 27,950 | 56.93 | $1,591,194 |
| | | 29-Nov-2016 | | 2,050 | 57.72 | $118,326 |
| | | 10-May-2017 | | 7,841 | 57.67 | $452,190 |
| | | 10-May-2017 | | 17,159 | 57.12 | $980,122 |
| | | 17-May-2017 | | 32,406 | 58.37 | $1,891,538 |
| | | 17-May-2017 | | 11,655 | 57.23 | $667,016 |
| | | 17-May-2017 | | 5,939 | 59.06 | $350,757 |
| | | 24-May-2017 | | 25,000 | 57.42 | $1,435,500 |
| | | 02-Nov-2017 | | 50,000 | 48.87 | $2,443,500 |
| | | | | **501,250** | | **$28,210,114** |
| Pugh, Gordon G. | Officer | 02-Mar-2015 | | 6,800 | 71.72 | $487,696 |
| | | 02-Mar-2015 | | 8,200 | 71.12 | $583,184 |
| | | 15-Apr-2015 | | 13,750 | 63.21 | $869,138 |
| | | 19-May-2015 | | 250 | 63.00 | $15,750 |
| | | 16-Jun-2015 | | 32,977 | 63.11 | $2,081,178 |
| | | 01-Jul-2015 | | 13,750 | 65.13 | $895,538 |
| | | 20-Jul-2015 | | 18,750 | 70.10 | $1,314,375 |
| | | 03-Aug-2015 | | 12,640 | 70.10 | $886,064 |
| | | 03-Aug-2015 | | 810 | 69.53 | $56,319 |
| | | 03-Aug-2015 | | 300 | 70.73 | $21,219 |
| | | 15-Dec-2016 | | 16,690 | 57.62 | $961,678 |
| | | 16-Dec-2016 | | 4,768 | 57.73 | $275,257 |
| | | | | **129,685** | | **$8,447,395** |
| Stejbach, Mark | Officer | 02-Nov-2015 | | 15,670 | 72.00 | $1,128,240 |

| | | | 02-Nov-2015 | 2,330 | 72.51 | $168,948 |
|---|---|---|---|---|---|---|
| | | | 01-Dec-2015 | 500 | 73.58 | $36,790 |
| | | | 01-Dec-2015 | 15,200 | 71.99 | $1,094,248 |
| | | | 01-Dec-2015 | 2,300 | 73.09 | $168,107 |
| | | | 28-Dec-2015 | 10,000 | 80.24 | $802,400 |
| | | | 04-Jan-2017 | 2,500 | 60.01 | $150,025 |
| | | | 05-Jan-2017 | 300 | 60.09 | $18,027 |
| | | | 06-Jan-2017 | 6,653 | 60.07 | $399,646 |
| | | | 09-Jan-2017 | 547 | 60.27 | $32,968 |
| | | | 08-Jun-2017 | 10,000 | 60.34 | $603,400 |
| | | | | **66,000** | | **$4,602,799** |
| **TOTAL** | | | | **1,717,513** | | **$102,158,608** |

115.    The shares sold by Alkermes' officers and directors during the Class Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).

116.    Indeed, defendant Pops sold 44% of his pre-Class Period Alkermes stock holdings during the Class Period for proceeds totaling $28,210,114, while defendant Frates sold 50% of his pre-Class Period Alkermes stock holdings during the Class Period for proceeds totaling $11,983,613. That both Individual Defendants sold large portions of their pre-Class Period Alkermes stock holdings during the Class Period for unusually large profits and at similar times supports a strong inference of scienter under a motive theory.

117.    Accordingly, Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of Alkermes common stock resulting from their false and misleading statements and omissions during the Class Period.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

118.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Alkermes common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

119.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alkermes common stock were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Alkermes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

120.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

121.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

122.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Alkermes;

- whether the Individual Defendants caused Alkermes to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of Alkermes' common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

123.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

124.   During the Class Period, the market for Alkermes common stock was an efficient market for the follow reasons, among others:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Alkermes common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold Alkermes common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

125.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

126.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

127.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Alkermes common stock and operated as a fraud or deceit on purchasers of such stock by failing to disclose and misrepresenting adverse facts. As such misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Alkermes stock declined significantly as the prior artificial inflation came out of the Company's stock price.

128.    As a result of its purchases of Alkermes common stock during the Class Period, Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Alkermes common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $80.69 on December 28, 2015.

129.    On Sunday, June 11, 2017, *The New York Times* published its article exposing the deceptive marketing campaign and aggressive lobbying efforts Defendants had engaged in.  The next business day, June 12, 2017, Defendants' schemes and tactics were further revealed by an

investigative article on NPR, which described how Defendants misleadingly marketed Vivitrol, while simultaneously lobbying to restrict access to other opioid treatment programs.

130.    The market reacted sharply to these reports, with shares of Alkermes stock declining from a close of $61.66 per share on Friday, June 9, 2017, to a low of $58.65 on Monday, June 12, 2017 – a decline of 4.9%.  This drop removed inflation from the price of Alkermes' stock, causing real economic loss to investors who purchased Alkermes' stock during the Class Period. Alkermes' stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, by Defendants during the Class Period.

131.    Following these reports, on June 13, 2017, *The Fix* published an article that further highlighted the Company's deceptive marketing and lobbying efforts and clarified that Vivitrol cannot properly be compared to the other two alternatives, as Defendants repeatedly did during the Class Period.

132.    The market further reacted to this report, with shares of Alkermes stock declining to a low of $57.29, a decline of 7.1% from Alkermes' closing stock price of $61.66 on Friday, June 9, 2017, before this information became known to the investing public.

133.    Later that month, on June 27, 2017, ProPublica released an article exposing Vivitrol's methods of "skirt[ing] the usual sales channels" by marketing Vivitrol directly to judges and prison officials, misleading them to believe that Vivitrol is the only way opioid addicts can lead a life of sobriety.

134.    The market reacted negatively to this news, with shares of Alkermes stock declining from a close of $58.30 per share on June 26, 2017, to a low of $57.05 on June 27 – a decline of 2.1%.

135.    Finally, on November 6, 2017, Senator Harris announced the opening of an investigation into Alkermes' sales practices for Vivitrol.

136.    The market reacted sharply to these reports, with shares of Alkermes stock declining from a close of $50.99 per share on Friday, November 3, 2017, to a low of $48.56 on Monday, November 6 – a decline of 4.7%.

137.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Alkermes' business and marketing tactics.  When the truth about the Company was revealed to the market, the price of Alkermes common stock substantially dropped. Such decline removed the inflation from the price of Alkermes common stock, causing real economic loss to investors who had purchased Alkermes common stock during the Class Period.

138.    The declines in the price of Alkermes common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Alkermes common stock negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

139.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Alkermes common stock and the subsequent significant declines in the value of Alkermes common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**NO SAFE HARBOR**

140.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any

forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew or had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Alkermes who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

141.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

142.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

143.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Alkermes common stock; and (iii)

cause Plaintiff and other members of the Class to purchase or otherwise acquire Alkermes common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

144.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Alkermes common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Alkermes' finances and business prospects.

145.    By virtue of their positions at Alkermes, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

146.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Alkermes, the Individual Defendants had knowledge of the details of Alkermes' internal affairs.

147.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Alkermes.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Alkermes' businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Alkermes common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Alkermes' business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Alkermes common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

148.    During the Class Period, Alkermes common stock were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Alkermes common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Alkermes common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Alkermes common stock declined

- 44 -

sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

149.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

150.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against The Individual Defendants)

151.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152.    During the Class Period, the Individual Defendants participated in the operation and management of Alkermes, and conducted and participated, directly and indirectly, in the conduct of Alkermes' business affairs.  Because of their senior positions, they knew the adverse non-public information about Alkermes.

153.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alkermes' financial condition and results of operations, and to correct promptly any public statements issued by Alkermes which had become materially false or misleading.

154.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alkermes disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alkermes to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Alkermes within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alkermes common stock.

155.     Each of the Individual Defendants, therefore, acted as a controlling person of Alkermes.  By reason of their senior management positions and/or being directors of Alkermes, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Alkermes to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Alkermes and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

156.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alkermes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Lead Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 9, 2018                           ROBBINS GELLER RUDMAN
                                               &  DOWD LLP
                                               DAVID A. ROSENFELD
                                               MICHAEL G. CAPECI


                                               _____
                                                     /s/ *David A. Rosenfeld*
                                               DAVID A. ROSENFELD

                                               58 South Service Road, Suite 200
                                               Melville, NY  11747
                                               Telephone:  631/367-7100
                                               631/367-1173 (fax)
                                               drosenfeld@rgrdlaw.com
                                               mcapeci@rgrdlaw.com

                                               *Lead Counsel for Plaintiff*

                                               CAVANAGH & O'HARA
                                               PATRICK J. O'HARA
                                               2319 West Jefferson Street
                                               Springfield, IL  62702
                                               Telephone:  217/544-1771
                                               217/544-9894 (fax)

                                               *Additional Counsel for Plaintiff*

- 47 -

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, certify that on March 9, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system for filing.  Based on the records on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the ECF registrants of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 9th day of March 2018, at Melville, New York.

*/s/ David A. Rosenfeld*