UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   :
                                                                :
NANCY GAGNON, Individually and On                               :
Behalf of All Others Similarly Situated,                        :
                                                                :
                    Plaintiff,                                  :        17cv9178
                                                                :
              -against-                                         :        OPINION & ORDER
                                                                :
ALKERMES PLC, RICHARD F. POPS and                               :
JAMES M. FRATES,                                                :
                                                                :
                    Defendants.                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   :

WILLIAM H. PAULEY III, Senior United States District Judge:

            Defendants Alkermes plc ("Alkermes"), Richard F. Pops, its Chief Executive

Officer, and James M. Frates, its Chief Financial Officer, move to dismiss the Second Amended

Complaint (the "Complaint") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Lead

Plaintiff Local 731 I.B. of T. Private Scavenger and Garage Attendants Pension Trust Fund

("Local 731") moves to strike various exhibits appended to Defendants' motion.  For the reasons

that follow, Local 731's motion to strike is granted in part and denied in part, and Defendants'

motion to dismiss is granted.

BACKGROUND

            The allegations in the Complaint are presumed true for purposes of this motion.

Alkermes is a global pharmaceutical company that markets and sells a product trade-named

Vivitrol, an injectable, extended-release version of an opioid dependence medication called

naltrexone.  This securities fraud class action concerns statements that Defendants made touting

Vivitrol's sales growth and its effectiveness in treating opioid dependence.  Local 731 claims

that while Defendants crafted a narrative of organic, word-of-mouth growth in SEC filings and

on investor conference calls, they concealed from investors a calculated and sustained campaign to market Vivitrol.

Starting in June 2017, the truth began to emerge through a steady cascade of news articles that shed a critical light on Alkermes' sales practices, academic studies that reached tepid conclusions as to Vivitrol's relative effectiveness, and revelations of governmental scrutiny of Vivitrol. Based on a progressive decline in Alkermes' stock price, plaintiffs assert claims against all Defendants for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, as well as Section 20(a) claims against Pops and Frates.

I. Opioid Dependence Treatments

Since the 1980s, naltrexone has existed to treat opioid dependence. (Second Amended Complaint, ECF No. 34 ("Compl."), ¶¶ 23-26.) In particular, naltrexone works by competing for the receptors in the brain that cause the "high" that one experiences from using opioids. However, several aspects of naltrexone contributed to its sparse use by the medical community. First, patients must endure a days-long detoxification process before beginning treatment. Second, naltrexone only provides a brief period of relief from opioid cravings and must be taken every day. Third, because it does not completely block the targeted brain receptors, its effects may be overcome with a sufficiently large quantity of opioids.

Alkermes sought to improve on naltrexone by developing Vivitrol, an injectable version of naltrexone that extends relief from opioid cravings for 28 days. (Compl. ¶¶ 27-29, 61.) Although Vivitrol obviates the need to take naltrexone every day, it functions in the same way as naltrexone. Thus, it is subject to the limitations that prospective patients must detoxify first before beginning treatment and that Vivitrol's salutary effects may be overcome by large quantities of opioids.

Other prominent treatments for opioid dependence include methadone and Suboxone (i.e., buprenorphine), both of which contain opioids. In contrast to "antagonist" treatments such as naltrexone and Vivitrol, these "agonist" treatments work by tricking the opioid receptors in the brain into believing that it has received the abused opioid. (Compl. ¶¶ 45-46.) This quality allows prospective patients to wean themselves off opioids without experiencing cravings or opiate withdrawal and without needing to detoxify before they begin treatment.

II.    Increase in Vivitrol Revenues

In 2010, the Food and Drug Administration ("FDA") approved Vivitrol for treating opioid dependence. (Compl. ¶ 28.) At that time, Vivitrol yielded anemic revenues for Alkermes because of naltrexone's many known limitations relative to other available treatments. (Compl. ¶ 32.) Recognizing that the medical community did not hold naltrexone in high regard, Defendants focused their efforts on attempting to convince drug courts, prison wardens, and law enforcement officials that methadone and Suboxone were less effective than Vivitrol because they contained opioids. (Compl. ¶¶ 43-55.) Specifically, Local 731 alleges that Alkermes circulated misleading and deceptive information that only highlighted methadone and Suboxone's drawbacks while giving short shrift to their benefits. (Compl. ¶¶ 40, 49-50.) Along similar lines, Alkermes routinely represented to the policymaking community that methadone and Suboxone were themselves addictive and abused, just like other opioids. (Compl. ¶ 51.) According to Local 731, Defendants took these actions, despite scientific data supporting the use of methadone and Suboxone in treating opioid addiction. (Compl. ¶¶ 4, 46.) And Local 731 claims that because this non-medical audience lacked a sophisticated understanding of treating opioid addition, Defendants saw these entities and individuals as easy marks for misinformation.

(Compl. ¶ 44.)

Even though Defendants lacked scientific evidence demonstrating Vivitrol's superiority over methadone and Suboxone, their allegedly aggressive and fraudulent marketing campaign paid off. A survey of criminal justice representatives found that most favored Vivitrol over methadone and Suboxone. (Compl. ¶ 55.) And Vivitrol sales rapidly increased starting in February 2015, eventually supplanting the sale of other products as the most important driver of Alkermes' revenue growth. (See Compl. ¶¶ 35-40.) In particular, between February 24, 2015 and November 14, 2017 (the "Class Period"), Vivitrol sales as a proportion of Alkermes' total revenues trended upward from over 20% starting in 2Q 2015 to over 30% starting in 1Q 2017. (Compl. ¶ 39.) Ultimately, Vivitrol's modest net sales of $28.9 million in FY 2011 ballooned to $209 million in FY 2016. (Compl. ¶ 41.)

III.    Defendants' Alleged Misstatements

Local 731 claims that Defendants made a series of materially misleading misstatements in investor and analyst calls between September 17, 2015 and June 6, 2017, as well as in Alkermes' Forms 10-K filed on February 24, 2015, February 25, 2016, and February 17, 2017. These misstatements, which generally relate to the reasons for Vivitrol's increased revenues and Vivitrol's efficacy, may be categorized as follows. First, Local 731 alleges that Defendants mischaracterized the adoption of Vivitrol as "organic" and "self-propagating" without revealing the role that their deceptive marketing and lobbying tactics played in driving Vivitrol's growth. (Compl. ¶¶ 56, 83-101.) Second, Local 731 avers that Defendants misrepresented Vivitrol's efficacy by guaranteeing that patients would not relapse for 28 days, despite having access to an in-house study finding that 30% of patients had relapsed within 28 days and a retrospective study revealing that several Vivitrol patients had overdosed within that

same period.  (Compl. ¶¶ 62-72, 102-103, 106-107, 112-119.)  Finally, Local 731 asserts that

Defendants falsely claimed that only Vivitrol—and not methadone or Suboxone—could lead to a

drug-free life, even though they lacked scientific data to substantiate that claim.  (Compl. ¶¶ 75-

81, 104-105, 108-111.)  Local 731 posits that these misstatements artificially inflated Alkermes'

stock price to $80.69 per share on December 28, 2015.  (Compl. ¶ 150.)

        The first rumblings that something was amiss came on June 11, 2017, when the

New York Times published an article exposing Alkermes' deceptive and aggressive efforts to

market Vivitrol by disparaging its competitors without any scientific basis.  (Compl. ¶¶ 120,

151.)  Over the next two days, NPR and The Fix followed on the heels of the New York Times,

further highlighting Alkermes' attempts to suppress the use of methadone or Suboxone by

lobbying for increased regulation of those drugs.  (Compl. ¶¶ 121-122, 151-154.)  After this

initial wave of disclosures, Alkermes' stock price dropped from a closing price of $61.66 the

Friday before the news broke to $57.29.  (Compl. ¶ 154.)  Alkermes' stock price gradually slid

over the next few months following a steady stream of disclosures of governmental scrutiny into

Vivitrol and damning information regarding Vivitrol's efficacy.

        For example, Local 731 alleges that ProPublica published an article on June 27,

2017 revealing Alkermes' possession of non-public, internal data showing that nearly 30% of

patients relapsed during the 28-day treatment period.  (Compl. ¶¶ 65-68, 123, 155.)  One month

later, Alkermes announced in its second-quarter Form 10-Q that it had received a subpoena from

federal prosecutors, seeking documents relating to Vivitrol.  (Compl. ¶¶ 58, 124, 157.)

Subsequently, the Journal of the American Medical Association published a study on October

18, 2017 concluding that Vivitrol was equally as effective as Suboxone in maintaining short-term

abstinence from opioid usage.  (Compl. ¶¶ 78, 125, 159.)  Following these disclosures, Senator

Kamala Harris announced an investigation into Alkermes' sales practices relating to Vivitrol on November 6, 2017. (Compl. ¶¶ 60, 126, 161.) Alkermes' stock-price slide was punctuated by a subsequent study published on November 14, 2017 that also found Vivitrol—at best—to be equally effective to Suboxone. (Compl. ¶¶ 79-80, 127, 163.) That day, Alkermes' stock closed at $47.58 per share. (Compl. ¶ 164.) This lawsuit followed.

<u>DISCUSSION</u>

The standard on a motion to dismiss under Rule 12(b)(6) is well settled. To withstand dismissal, a pleading "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citation omitted). Thus, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. Although the plausibility standard is "not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678. In deciding a motion to dismiss under Rule 12(b)(6), a court must accept factual allegations as true and construe all reasonable inferences in the plaintiff's favor. <u>ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 196 (2d Cir. 2009).

I.    <u>Motion to Strike</u>

In determining whether dismissal is warranted, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." <u>Kleinman v. Elan Corp., plc</u>, 706 F.3d 145, 152 (2d Cir. 2013). Defendants attach 36 exhibits totaling almost 1,300 pages to their motion papers. (<u>See</u> Declaration of Deborah S. Birnbach in Support

of Defendants' Motion to Dismiss the Second Amended Class Action Complaint, ECF No. 38 ("Birnbach Decl.").) Local 731 principally seeks to strike three categories of exhibits as improper: (1) Exhibits G, L, M, N, P, R, Y, and JJ, which purportedly demonstrate that Defendants truthfully disclosed Vivitrol's efficacy to the market; (2) Exhibits E and H, which are a Form 8-K and Form 10-Q; and (3) Exhibits T, U, V, W, and X, which are Forms 4 for Pops, Frates, and other Alkermes officers and directors.

Of course, a court may not consider <u>any</u> materials outside of the pleadings that do not fall within one of the established exceptions without converting the motion to a Rule 56 motion, irrespective of whether a party has moved to strike them. <u>See</u> Fed. R. Civ. P. 12(d); <u>see also</u> <u>Glob. Network Commc'ns, Inc. v. City of N.Y.</u>, 458 F.3d 150, 155 (2d Cir. 2006) (explaining that Rule 12(d)'s conversion requirement is "strictly enforce[d]" and "mandatory"). Thus, this Opinion & Order also briefly addresses the remainder of the exhibits submitted with Defendants' motion to dismiss, as well as those attached to Local 731's opposition to the motion. (<u>See</u> Declaration of David A. Rosenfeld in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss the Second Amended Complaint, ECF No. 45 ("Rosenfeld Decl.").)

A. <u>Vivitrol Efficacy Disclosures</u>

Local 731 seeks to strike various documents relating to Vivitrol on which Defendants rely to show that they had already publicly disclosed Vivitrol's relapse rate.

1. <u>FDA Labels</u>

Exhibits G and L are, respectively, the original and updated versions of Vivitrol's FDA-approved label. Courts have taken judicial notice of the fact of disclosure of the contents of FDA labels, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); <u>see also, e.g.</u>, <u>Chandler v. Janssen</u>

Pharm., Inc., 322 F. Supp. 3d 314, 323-24 (E.D.N.Y. 2018) (taking judicial notice of FDA-approved labels to show when warning labels were provided to physicians); cf. Casey v. Odwalla, Inc., 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) (collecting cases) (noting that the majority of courts, "particularly in this district, that took judicial notice of FDA letters on a motion to dismiss . . . did so where the document was publicly available on the FDA's website"). Thus, Exhibits G and L may be considered to the extent they indicate the disclosure of their contents at some particular time.

      2.  <u>Investor Materials</u>

Exhibits M, R, HH, and JJ are materials that Pops and Frates showed to investors during investor presentations referenced in the Complaint. These materials may not be considered because they were not attached to the Complaint and the Complaint makes no reference to the presentations themselves, much less one that is "clear, definite[,] and substantial." <u>Alexander v. Possible Prods., Inc.</u>, 336 F. Supp. 3d 187, 194 (S.D.N.Y. 2018) (citations omitted); <u>see Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.</u>, --- F. Supp. 3d ---, 2019 WL 1247583, at *3 (S.D.N.Y. 2019) (collecting cases). Although Defendants contend in the alternative that these materials may be considered as integral to the Complaint, such an assertion misunderstands the relevant standard. For a document to be integral to a complaint, a plaintiff must have known of or possessed the document <u>and</u> "relied heavily upon its terms and effect" in drafting the complaint. <u>See Chambers v. Time Warner</u>, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted); <u>accord Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007) ("[A] document 'upon which [the complaint] <u>solely</u> relies and which is <u>integral to the complaint</u>' may be considered by the court." (emphasis in original) (citation omitted)). As the Second Circuit explains, this typically means that the document "is a contract or other legal

document containing obligations upon which the plaintiff's complaint stands or falls . . . ." <u>Glob. Network Commc'ns, Inc.</u>, 458 F.3d at 157.

Exhibits N and P are academic articles cited in investor presentations and an earnings call referenced in the Complaint. Defendants correctly observe that courts may take judicial notice not of the truth in news articles, but that their contents are publicly available. On the other hand, judges in this district have reached divergent conclusions as to whether this principle may be extended to academic articles or studies. <u>Compare</u> <u>Bais Yaakov of Spring Valley v. Alloy, Inc.</u>, 936 F. Supp. 2d 272, 278 (S.D.N.Y. 2013) (taking judicial notice of a journal article), <u>with</u> <u>In re PetroChina Co. Sec. Litig.</u>, 120 F. Supp. 3d 340, 354 n.14 (S.D.N.Y. 2015) (declining to take judicial notice of academic articles). Nonetheless, because Exhibits N and P are unnecessary for determination of Defendants' motion, this Court declines to consider them.

       3.  <u>May 9, 2018 Letter</u>

Exhibit Y is a letter between counsel that Defendants proffer solely to demonstrate that Local 731 knew of public disclosures regarding Alkermes' relapse rates. This letter will not be considered because it was not attached to the Complaint, incorporated by reference, or integral to the Complaint.

  B.  <u>SEC Filings</u>

Exhibits E and H—Alkermes' Form 8-K and Form 10-Q—are required SEC filings that Alkermes made before the Class Period. Defendants rely on these filings to demonstrate that Alkermes publicly disclosed Vivitrol's relapse rate. These SEC filings may be considered for the fact that they contained certain information and that their contents were publicly disclosed, but not for the truth of their contents. <u>See</u> <u>Staehr v. Hartford Fin. Servs. Grp.</u>,

Inc., 547 F.3d 406, 425 (2d Cir. 2008); Roth, 489 F.3d at 509; see also Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (explaining that (1) "no serious question as to their authenticity can exist"; (2) the documents "are relevant not to prove the truth of their contents but only to determine what the documents stated"; (3) "a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents"; and (4) a court "may take judicial notice of the contents of [these documents] as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'" (citation omitted)).

Exhibits T and U are Pops' and Frates' respective Forms 4 and Schedules 14A that reflect their stock holdings and sales during the Class Period. Exhibits V and W are Forms 4 for Pops and Frates for a control period of identical duration to the Class Period that immediately precedes the Class Period. Exhibit X compiles Forms 4 for other Alkermes officers and directors not named as defendants. Defendants rely on these disclosures to undermine any inference of scienter based on motive and opportunity. Courts in this district have regularly considered Forms 4 on motions to dismiss, even for the truth of their contents. Abely v. Aeterna Zentaris Inc., 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013); see also In re Bear Stearns Cos. Sec., Derivative & ERISA Litig., 763 F. Supp. 2d 423, 583-84 (S.D.N.Y. 2011) (collecting cases); Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 133 (D. Conn. 2007) (collecting cases). But cf. Wagner v. Royal Bank of Scot. Grp. PLC, 2013 WL 4779039, at *3 (S.D.N.Y. Sept. 5, 2013) (suggesting that Forms 4 may be considered only to establish their contents, but not their truth). Because the Forms 4 that Defendants attach are unnecessary to this Court's decision, it declines to consider Exhibits T, U, V, W, and X.

C.  Documents Not Subject to Local 731's Motion to Strike

With respect to the documents not subject to Local 731's motion to strike, the remaining SEC filings may be considered not to establish the truth of their contents, but to demonstrate the fact of their disclosure.  Staehr, 547 F.3d at 425.  The transcripts of the investor calls and presentations referenced in the Complaint, which are directly quoted in the Complaint, may also be considered to show what was said to investors.  E.g., Pehlivanian v. China Gerui Advanced Materials Grp., Ltd., 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015); Malin, 499 F. Supp. 2d at 131.  Further, this Court deems the news articles that the Complaint explicitly identifies and quotes from—in some cases, substantially—incorporated by reference.  See Alexander, 336 F. Supp. 3d at 194.  Moreover, the price of Alkermes' stock, which is publicly listed on NASDAQ, is undoubtedly proper for judicial notice.  Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.").

On the other hand, this Court will not consider the letter dated May 9, 2018 between counsel in which Local 731's counsel requests clarification on the date that one of Alkermes' Forms 10-Q was filed, nor the screenshot of a paywall that Local 731 offers to rebut the suggestion that Defendants' disclosure of Vivitrol's relapse rate is publicly available. Neither of these documents were attached to the Complaint, incorporated by reference, or integral to the Complaint.  Finally, Local 731 and Defendants submit summaries compiling the statements alleged to be actionable and detailing calculations derived from the Forms 4.  To the extent that these exhibits are based on the Complaint, the Forms 4, or other documents properly considered on a motion to dismiss, this Court refers to that source material.  See, e.g., Malin, 499 F. Supp. 2d at 134 (considering summaries of information only by reference to the underlying

documents).

II.    <u>Section 10(b) and Rule 10b-5 Claims</u>

        To prevail on a Section 10(b) and Rule 10b-5 securities fraud claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 552 U.S. 148, 157 (2008). Only the first two elements of a securities fraud claim are at issue here—that is, whether Local 731 has adequately pled an actionable misstatement or omission, and separately, whether Local 731 has alleged facts giving rise to a strong inference of scienter.

        In addition, both Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") impose heightened pleading requirements, which "together require plaintiffs to plead the circumstances purportedly constituting fraud with particularity." <u>Martin v. Quartermain</u>, 732 F. App'x 37, 39 (2d Cir. 2018) (summary order).

   A.    <u>Actionable Misstatement</u>

        As an initial matter, Local 731 principally proceeds on a theory of material misstatements and half-truths, not pure omissions that "[are] actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 239 (2d Cir. 2016) (citations and quotation marks omitted) (distinguishing among misstatements, half-truths, and pure omissions). Thus, Local 731 must plead a statement "that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d at 239. Statements may also be categorized as statements of fact and opinions. "A fact is a thing done or existing or [a]n actual happening. An

opinion is a belief[,] a view, or a sentiment which the mind forms of persons or things.  Most

important, a statement of fact . . . expresses certainty about a thing, whereas a statement of

opinion . . . does not."  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,

135 S. Ct. 1318, 1332 (2016).

Statements of fact may be actionable if (1) they are false; or (2) if they are

literally true but misleading "through their context and manner of presentation."  Kleinman, 706

F.3d at 153.  Opinions may be actionable if (1) the speaker "did not hold the belief [he]

professed" or the "supporting facts [he] supplied were untrue"; or (2) if the speaker "omits the

information whose omission makes the statement misleading to a reasonable investor," even if

the opinion is "sincerely held and otherwise true as a matter of fact."  Tongue v. Sanofi, 816 F.3d

199, 210 (2d Cir. 2016) (citation omitted).  However, for the second basis for opinion liability,

"[t]he core inquiry is whether the omitted facts would 'conflict with what a reasonable investor

would take from the statement itself,'" and "a statement of opinion 'is not necessarily misleading

when an issuer knows, but fails to disclose, some fact cutting the other way.'"  Tongue, 816 F.3d

at 210 (citation omitted).

And as a pleading matter, Rule 9(b) requires a plaintiff to "state with particularity

the circumstances constituting fraud," which means that a securities fraud class action based on

misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir.

2012); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA

adds to these requirements, mandating that "the complaint . . . specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an

13

allegation regarding the statement or omission is made on information and belief, [that] the complaint . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  With these general principles in mind, this Court turns to Defendants' alleged misstatements.

      1.  <u>Vivitrol's Growth</u>

      The first category of misstatements relates to Defendants' purported misrepresentations about Vivitrol's growth.  Specifically, while investors knew that Alkermes sought to market Vivitrol to the non-medical policymaking community, Defendants characterized that community's growing adoption of Vivitrol to investors as "organic," "self-propagating," and "very grassroots, viral."  (Compl. ¶¶ 87, 97.)  In the same vein, Defendants mused that it "might be a single sheriff or it might be a single drug court, starts using Vivitrol and they start seeing outcomes and it begins to proliferate" and that "other jurisdictions see what is happening and they begin to start pushing for the implementation of Vivitrol programs on their own without our help."  (Compl. ¶¶ 85, 93.)  Defendants further gushed that "[w]hat's most exciting is how an expanding array of states, counties, and municipalities are beginning to integrate the use of Vivitrol into their criminal justice and healthcare systems," and that "what's cool is the way these are beginning to burgeon is because – not Alkermes people out in those states necessarily pushing all these programs."  (Compl. ¶¶ 91, 97.)  Finally, Local 731 points to Defendants' representations in its 2014, 2015, and 2016 Forms 10-K that Alkermes engaged in "customary pharmaceutical company practices" in promoting its products.  (Compl. ¶¶ 83, 89, 100.)  On the whole, Local 731 submits that these statements are misleading because Defendants failed to disclose their aggressive and deceptive marketing practices and that those practices drove the increased demand in Vivitrol.

For the most part, these statements are non-actionable.  First, Defendants'

characterizations of Vivitrol as "start[ing] to become a little bit organic" or "just a very

grassroots, viral thing that's propagating throughout the country" or "becoming self-

propagating"[1] are statements of puffery that are "too general to cause a reasonable investor to

rely upon them."  See ECA, 553 F.3d at 206; accord Galestan v. OneMain Holdings, Inc., 348 F.

Supp. 3d 282, 297-98 (S.D.N.Y. 2018) ("Puffery is an optimistic statement that is so vague,

broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it

immaterial as a matter of law." (citation omitted)).  Read in context, the vague descriptions of

Vivitrol as starting to become "organic" or "grassroots" or "viral" convey "no meaningful,

objective data that an investor would rely on" in that they cannot be measured or verified.  Okla.

Firefighters Pension & Ret. Sys. v. Xerox Corp., 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018)

(quoting Billhofer v. Flamel Techs., S.A., 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012)).

Further, Defendants' enthusiasm about Vivitrol's growing adoption without necessarily being

pushed by Alkermes are not rendered false or misleading by the existence of Alkermes'

undisclosed marketing campaign.  Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233, 241

(S.D.N.Y. 2015) (finding that "media reports show[ing] that the BlackBerry 10 devices were not

---

[1]    The Complaint quotes Defendants as claiming that "Vivitrol is becoming self-propagating . . . because it's
the only medication that has no diversion or addictive potential."  (Compl. ¶ 98.)  This chimeric statement splices
together sections of Defendants' remark that "[f]rom very modest beginnings, now VIVITROL is becoming self-
propagating" and the following:

> There are more than 300 pilot programs or full programs now going on in 35 states around the country.  And
> the figure shows the flavors of these, where – from legislatures that have passed a new law that changes the
> way that funding and treatment is provided in the state, to public health initiatives that are happening outside
> the criminal justice system, just in kind of the Medicare and Medicaid world, to drug court initiatives and
> criminal justice reentry initiatives that are very VIVITROL focused, because it's the only medication that
> has no diversion or addictive potential.

(Compl. ¶ 97.)  Local 731 does not appear to quibble with Defendants' claim that Vivitrol is the only medication
without diversion or addictive potential.  Rather, Local 731 contends that the quoted statement is false to the extent
that it claims Vivitrol is "self-propagating" by failing to disclose the role of Alkermes' marketing and lobbying.

selling well in foreign markets . . . does not contradict generally optimistic sentiments that the Z10 devices were being 'embraced by customers and marked a 'transition' for the company" (internal citation omitted)). Finally, a reasonable investor would not view Defendants' hypothetical vignettes as to how Vivitrol may proliferate as representations of existing fact, but rather as general aspirational statements.

Likewise, the statements in Alkermes' annual reports regarding its use of customary marketing practices do not give rise to violations of the federal securities laws. To be sure, cases in this district have affirmed that the knowing or reckless failure to follow policies announced in public filings may cause those filings to be materially misleading to the extent that the alleged deviations are so pervasive as to suggest that "the announced policy never reflected or 'no longer reflected actual practice.'" Lewy v. SkyPeople Fruit Juice, Inc., 2012 WL 3957916, at *20 (S.D.N.Y. Sept. 10, 2012) (citations omitted) (discussing Second Circuit precedent). By contrast, the boilerplate statements in Alkermes' public filings that essentially warrant compliance with "customary pharmaceutical company practices" are too general to induce reliance by a reasonable investor. Cf. ECA, 553 F.3d at 206 (finding company's "mere[] generalizations regarding [its] business practices" to be "precisely the type of puffery that this and other circuits have consistently held to be inactionable" (citation and quotation marks omitted)).

Moreover, what Local 731 omits from its reference to "customary pharmaceutical company practices" provides important context. In particular, Alkermes' Forms 10-K state that it "use[s] customary pharmaceutical company practices to market our product and to educate physicians, such as sales representatives calling on individual physicians, advertisements, professional symposia, selling initiatives, public relations and other methods." (Compl. ¶¶ 83,

89 (emphasis added); see also Compl. ¶ 100 (omitting "public relations" but containing an otherwise identical statement).) Against this backdrop, the challenged statements cannot be said to be untrue or materially misleading. Indeed, an investor may reasonably understand that the seller of a product would attempt to highlight its product's advantages or its competitors' disadvantages—that Alkermes did not describe these efforts as deceptive or misleading does not make its disclosures actionable. See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (explaining that a company is "not required to 'accuse itself of antisocial or illegal policies'" and that the "securities laws do not require corporate management to 'direct conclusory accusations at itself or to characterize its behavior in a pejorative manner'" (citations omitted)).

While a close call, Frates' July 28, 2016 statement that "[w]e're continuing to see accelerating sales growth in both commercial sales and even more so in Medicaid sales driven by our focus on criminal justice programs and our organic growth within the states" may be actionable by omitting material information regarding the role that Alkermes' intense lobbying and marketing efforts played in Vivitrol's financial success. To be sure, "the securities laws do not impose a general duty to disclose corporate mismanagement and uncharged criminal conduct." In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). But "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d at 469 (citations omitted). This means that for "allegations of corporate mismanagement, disclosure is required where 'a failure to disclose facts that amount to mismanagement may render other misstatements misleading.'" In re Marsh & McLennan Cos. Sec. Litig., 501 F. Supp. 2d at 469 (citations omitted).

In making this determination, judges in this district routinely decline to impose liability for statements where the subject matter of the statements is not sufficiently connected to the undisclosed corporate misconduct.  See In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (describing the "critical consideration" in determining whether a corporation must disclose mismanagement to ensure that its statements are not misleading as "whether 'the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading'" (citation omitted) (alteration in original)).  Such a connection may arise in three circumstances:

> First, a duty to disclose uncharged wrongdoing can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices.  Second, a duty to disclose may arise when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring.  Third, a duty to disclose can arise when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief.

Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (internal citations and quotation marks omitted).  As relevant here, if a company "puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'"  See, e.g., In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (citations omitted); accord In re VEON Ltd. Sec. Litig., 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017).

As an initial matter, it bears clarifying what Local 731's claim does not allege.  In particular, the challenged statement follows Defendants' representation that in the relevant quarter, Vivitrol's "net sales grew to $47.2 million, compared to $37.2 million for the same period last year."  (Comp. ¶ 95.)  Local 731 does not, however, challenge the accuracy of these revenue figures themselves.  See In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 511

(S.D.N.Y. 2009) (explaining that "a 'company's misleading statements about the source of its revenue do not make the company's statements of the revenue figures misleading'" (citation omitted)).  Instead, the thrust of Local 731's contention is that by speaking about the sources of Vivitrol's increasing sales, Defendants had a duty to fully and accurately disclose the facts pertaining to its marketing of Vivitrol to stakeholders in the criminal justice system and the role that those efforts played in Vivitrol's financial success.  Although Defendants correctly point out that they <u>had</u> attributed the source of Vivitrol's financial success to their focus on criminal justice programs,[2] Local 731 alleges that they failed to disclose the true (and improper) nature of those efforts.  (<u>See</u> Compl. ¶¶ 40, 43.)  These allegations, at this stage, properly plead an actionable half-truth.  <u>Accord</u> <u>In re Virtus Inv. Partners, Inc. Sec. Litig.</u>, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016).

2.  <u>Vivitrol's Efficacy</u>

Local 731 also alleges that Defendants misrepresented Vivitrol's efficacy.  In particular, Defendants informed investors as follows:

- <u>This is a once-a-month medication that blocks opioid receptors in the brain and prevents relapse to opioid dependence.</u>

- Vivitrol is – you live a drug-free life.  You have to be detoxified, so you have to go through the process of detoxification.  That can happen brutally in a jail cell, or it can happen more gently under medical supervision.  <u>Then you get that monthly injection and you cannot reestablish physical dependence on the opioid.</u>

- You have to be detoxed.  So, you have to go through 7 to 10 days of detox to be opiate-free.  <u>And then you take an injection of Vivitrol, and that prevents your relapse, according to our label, back to opiate dependence, because it's an antagonist and it stays on board for a month.</u>

- You see the cover of the Washington Post Magazine.  Breaking good: VIVITROL, a drug

---

[2]      To the extent that Defendants maintain that any omissions regarding Alkermes' marketing campaign would not alter the total mix of information already available to investors, courts are generally loath to determine such questions of immateriality at the pleading stage unless the misstatement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  <u>ECA</u>, 553 F.3d at 197.

given as a monthly shot is helping addicts stay clean.  This is the preferred drug in the criminal justice system because it has no addictive potential.  It is given once a month.  Think about in the context of parole or probation.  <u>You know that person gets their shot once a month.  They are not going to relapse to opioid dependence.</u>  New York magazine, Forbes magazine, CBS, NPR, AP, Fox News, it's all happening now.  People are beginning to – this is moving itself into the public consciousness.

- Vivitrol.  So, Vivitrol also is a unique medicine.  And starting on the far left, the indication, it is the only drug – the FDA label says it is approved, indicated for preventing relapse to opioid dependence.  That's a remarkable statement for a clinician and for a patient.  <u>If you take this medicine each month, you will not relapse to opioid dependence.</u>

- So now on to VIVITROL.  Gaining more and more recognition.  This is a monthly injection, a 28-day injection of naltrexone, extended-release naltrexone for the treatment of opioid and alcohol dependence.  It really stands alone as the only nonaddictive product in the market.  Naltrexone is an antagonist.  It has no street value.  It's never been diverted.  And <u>with 28 days of relapse prevention, as the label says, it prevents relapse to opioid dependence.</u>

(Compl. ¶¶ 102, 106, 112, 114, 116, 118 (emphases in original).)  According to Local 731, these statements are misleading because Vivitrol's FDA labels warrant that it only offers the <u>possibility</u> of preventing relapse.  Local 731 also points to an in-house study presented at a non-public April 2014 conference purportedly concluding that Vivitrol had a 30% relapse rate during a 28-day period.  Finally, it cites a post–Class Period study from March 2018 concluding that between October 2010 and March 2016, Alkermes reported to the FDA that several Vivitrol patients had overdosed on opioids within 28 days after receiving a dose of Vivitrol.

However, the study that Local 731 characterizes as finding a 30% relapse rate yields, at best, a marginal inference of falsity.  The study—funded by Alkermes and involving Alkermes-affiliated doctors—was discussed in a PowerPoint presented to participants of an April 2014 conference closed to the general public.  (Compl. ¶¶ 66-67.)  As relevant here, the study found that "nearly 30% of Vivitrol users never took their second dose of Vivitrol."  (Compl. ¶ 68.)  Although the Complaint continues that "[t]his means that a significant number of Vivitrol patients relapsed within the 28-day time period that Defendants falsely claimed was a window

where relapse would not happen," (Compl. ¶ 68), it is not immediately apparent why that must be the case, cf. Pehlivanian, 153 F. Supp. 3d at 645 (explaining that "the Second Circuit has repeatedly indicated that plaintiffs cannot simply assert that a statement is false—'they must demonstrate with specificity why . . . that is so'" (citation omitted) (alteration in original)).  But even assuming the correctness of Local 731's interpretation of the study's findings, it "took place from 2011 to 2013 across 32 treatment centers in the U.S."  (Compl. ¶ 70.)  It is well-settled that the securities laws impose liability for misstatements only when "an alleged material misstatement was false at the time it was made."  In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original).  Thus, whether this study allows any meaningful inferences to be drawn as to the veracity of Defendants' statements made at least two years later is questionable.

More fundamentally, however, this Court disagrees with the assertion that these challenged statements constitute ironclad guarantees of Vivitrol's effectiveness in perpetuity such that the existence of incidental overdoses while undergoing treatment with Vivitrol renders Defendants' statements false or misleading.  To be sure, Defendants' use of phrases such as "will not" or "cannot" implies—read literally and in a vacuum—some assurance against relapse.  However, the remarks surrounding the purportedly false or misleading statements reveal that the challenged statements explained how Defendants intended or expected Vivitrol to work—a reading corroborated by Defendants' repeated references to Vivitrol's FDA label.  See Pehlivanian, 153 F. Supp. 3d at 647-48 (reiterating that "to be actionable, 'the representation must be one of existing fact, and not merely an expression of opinion, expectation[,] or declaration of intention'" (citation omitted)).  Indeed, Defendants' statements do not make any factual representations as to Vivitrol's rate of relapse in any historical period or purport to

represent Vivitrol's relapse rate as a factual matter at the time the statements were made.

### 3. Vivitrol's Competitors

Finally, Local 731 asserts that Defendants misleadingly claimed that Vivitrol was superior to methadone and Suboxone by asserting that "[Vivitrol is] for those patients who want to live a drug-free life" and claiming that it "giv[es] [patients] an opportunity to get to a drug-free life, to get to abstinence – that's what our drug does." (Compl. ¶¶ 104, 110.) Further, in discussing Vivitrol's growing adoption, Defendants remarked that "it's difficult to overstate how different treatment with Vivitrol is in opioid dependence compared to treating somebody with Suboxone or methadone, where you maintain the patient's physical dependence on the opioid." (Compl. ¶ 108.) Local 731 contends that these statements were misleading because Defendants ignored that methadone and Suboxone also enabled patients to live a drug-free life. In addition, Local 731 contends that Defendants lacked a scientific basis for their statements because no studies had compared Vivitrol's efficacy relative to its competitors at the time Defendants made them.

The statements that Vivitrol is "for those patients who want to live a drug-free life" or that it gives patients "an opportunity to get to a drug-free life" are vague, aspirational statements that do not give rise to a violation of the securities laws. See Altayyar v. Etsy, Inc., 242 F. Supp. 3d 161, 177-78 (E.D.N.Y. 2017), aff'd, 731 F. App'x 35 (2d Cir. 2018) (summary order). Moreover, the mere fact that Vivitrol's competitors also enable patients to achieve a drug-free life or that they are also presumably for those who desire a drug-free life simply does not bear on the veracity of Defendants' statements about Vivitrol. Cf. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or

defeatist view of the future; subject to what the current data indicates, they can be expected to be confident about their stewardship and the prospect of the business that they manage.'" (citation omitted)). Certainly, a business cannot be expected to advertise its competitors' products each time it speaks about its own products so long as its own statements are not false or misleading.

Finally, Local 731 fails to plausibly allege the falsity or misleading nature of Defendants' comment regarding how different Vivitrol was from its competitors in treating opioid dependence. This statement stresses the functional <u>distinction</u> between agonist and antagonist treatments—one that Local 731 does not seem to dispute. But it requires a greater inferential leap to say that Defendants touted the <u>superiority</u> of Vivitrol compared to methadone and Suboxone. In other words, though reasonable investors may well be left with an accurate impression that these drugs function in different ways, the statement does not leave <u>any</u> impression as to which treatment is more effective. Cf. <u>In re Inv. Tech. Grp., Inc. Sec. Litig.</u>, 251 F. Supp. 3d 596, 613 (S.D.N.Y. 2017) (explaining that comments distinguishing company's actions from competitor's regulatory misconduct "could have given a reasonable investor a false impression about [the company's] historical business operations and potential regulatory exposure" where complaint alleged that the company had also engaged in regulatory misconduct). And in any event, it "suggest[s] nothing more than [Defendants'] confidence in its competitiveness." <u>Okla. Firefighters Pension & Ret. Sys.</u>, 300 F. Supp. 3d at 569 (finding non-actionable statement that "[t]his idea of platform is something that we spend a lot of time talking about that it's important that you understand that helps us differentiate ourselves from our competitors around the world").

B. <u>Scienter</u>

Though Local 731 has adequately pled an actionable misstatement based on

Frates' representation during the July 28, 2016 conference call that Vivitrol's accelerating sales were "driven by our focus on criminal justice programs and our organic growth within the states," its securities fraud claim fails at the scienter prong.

Under the PSLRA, a securities fraud plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). While the PSLRA does not define a "strong inference," the Supreme Court has interpreted it to require more than a merely plausible or reasonable inference—rather, a strong inference is shown "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference" of nonfraudulent intent that can be drawn from the allegations. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 324 (2007). In determining whether a plaintiff has demonstrated a strong inference of scienter, a court must "'tak[e] into account plausible opposing inferences' and consider[] 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (citing Tellabs, Inc., 551 U.S. at 323-24). Nevertheless, the inference need not be "irrefutable" or of "the smoking-gun genre," or even the "most plausible of competing inferences." Tellabs, 551 U.S. at 324. Further, "the court's job is not to scrutinize each allegation in isolation," but to consider whether the allegations taken collectively raise a strong inference. Tellabs, 551 U.S. at 326.

Under the PSLRA's state of mind requirement, a plaintiff must show that defendant acted with the "intent to deceive, manipulate, or defraud," Tellabs, Inc., 551 U.S. at 319, or with recklessness, Blanford, 794 F.3d at 305. In this circuit, the scienter requirement may be met in two ways: (1) a "motive and opportunity to commit the fraud"; or (2) "strong

circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc., 493 F.3d at 99. Local 731 contends that it has adequately pled scienter based on both theories.

1. <u>Motive and Opportunity</u>

To raise a strong inference of scienter based on "motive and opportunity," Local 731 "must allege that [Alkermes] or its officers 'benefitted in some concrete and personal way from the purported fraud,'" typically by alleging that corporate insiders "ma[de] a misrepresentation in order to sell their own shares at a profit." ECA, 553 F.3d at 198 (citing Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). As an initial matter, corporate officers and directors are presumed to have the opportunity to commit fraud. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006). Thus, the sole inquiry is whether Local 731 has adequately pled motive.

To establish motive, a plaintiff bears the burden of "establish[ing] that the sales were 'unusual' or 'suspicious'"—the "mere fact that insider stock sales occurred does not suffice." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (citation omitted); accord Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995). The considerations germane to whether sales are unusual or suspicious include "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018).

Here, Local 731 points to Pops and Frates' Class Period stock sales as indicative

of their motive to defraud investors. To that end, the Complaint alleges that various high-level Alkermes officers—including Pops and Frates—received over $103 million in gross proceeds from stock sales during the Class Period. (Compl. ¶ 130.) Specifically, Pops' sale of 501,250 shares between September 17, 2014 and November 2, 2017 generated $28,210,114 in total proceeds, of which $15,881,295 were net profits. (Compl. ¶ 132.) Frates' sale of 214,663 shares between March 10, 2015 and November 8, 2017 generated $12,979,557 in total proceeds, of which $8,251,808 were net profits. (Compl. ¶ 133.) These sales, which include vested shares available to be sold, represent 12.2% of Pops' holdings and 26.1% of Frates' holdings. (Compl. ¶¶ 132-133.) The parties spar over the import of Defendants' trading during the Class Period, including the extent to which their holdings changed during the Class Period as compared to an immediately preceding control period, the extent to which sales were conducted pursuant to discretionary Rule 10b-5 trading plans, and precisely when the Defendants entered into those plans. But in light of the determination that only Frates' July 28, 2016 misstatement relating to the source of Vivitrol's growing revenue is actionable, this Court need not enter the fray.

As relevant here, the Complaint indicates that only two officers and directors—neither of which are Pops or Frates—had even sold Alkermes stock in July or August of 2016. The timing, magnitude, and nature of these sales do not establish that they were unusual, suspicious, or otherwise suggestive of a concrete and personal benefit as a result of the alleged fraud. First, Elliot Ehrich, an Alkermes officer, sold 800 shares on July 28, 2016 for $41,456 in total proceeds and 34,399 shares on July 27, 2016 for $1,787,028 in total proceeds. (See Compl. ¶ 130.) But these sales both occurred before Frates' July 28, 2016 misstatement, undermining the inference that they constitute the fruits of a fraudulent statement. See Ong v. Chipotle Mexican Grill, Inc., 2017 WL 933108, at *16 (S.D.N.Y. Mar. 8, 2017) ("[S]ales made only

before alleged misstatements may be inconsistent with a motive showing.").  Second, Paul

Mitchell, an Alkermes director, sold 2,000 shares on July 5, 2016 for $91,620 in total proceeds

and another 2,000 shares on August 4, 2016 for $98,960 in total proceeds.  (See Compl. ¶ 130.)

However, these sales are part of a consistent pattern of sales of 1,500–2,000 shares at the

beginning of each month.  As such, this Court concludes that they are neither suspicious nor

unusual in timing or magnitude.

### 2. Conscious Misbehavior or Recklessness

"Conscious misbehavior or recklessness" is a "state of mind 'approximating

actual intent,' which can be established by 'conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it.'"

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir.

2014).  Conscious misbehavior or recklessness may be inferred where defendants (1) "engaged

in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that

their public statements were not accurate"; or (3) "failed to check information they had a duty to

monitor."  Blanford, 794 F.3d at 306 (quotation mark and citations omitted).  Where, as here, a

plaintiff cannot make a showing of "motive," the "strength of the circumstantial allegations must

be correspondingly greater."  ECA, 553 F.3d at 198-99.

Local 731 does not appear to contend that Defendants acted with the requisite

state of mind based on any deliberately illegal behavior or that they failed to check information

that they had a duty to monitor.  Thus, whether Local 731 satisfies the scienter inquiry turns on

whether corporate insiders knew facts or had access to information suggesting that Frates'

statement was inaccurate.  To determine whether a plaintiff has "'specifically alleged

defendants' knowledge of facts or access to information contradicting their public statements,' 'Second Circuit cases uniformly rely on allegations that [1] <u>specific</u> contradictory information was available to the defendants [2] <u>at the same time</u> they made their misleading statements.'" <u>In re PXRE Grp., Ltd., Sec. Litig.</u>, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (citations omitted) (alterations and emphases in original); <u>see also</u> <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." (quotation marks omitted) (alteration in original)).

On balance, this Court concludes that the Complaint does not sufficiently allege that Frates—or any other corporate insider whose scienter may be imputed to Alkermes—knew contrary facts or had access to information contradicting his July 28, 2016 misstatement. Local 731 points to two pieces of information to support an inference of scienter. First, it alleges that Alkermes' Director of Public Relations acknowledged the company's 2016 circulation of a white paper attacking Suboxone. (Compl. ¶¶ 49-50; Birnbach Decl. Ex. D.) Second, Local 731 avers that sometime between 2011 and 2014, the former Secretary of Maryland's Department of Health and Hygiene called a meeting with Alkermes to "tell the company to 'back off talking down methadone and [Suboxone]' to legislators." (Compl. ¶ 52 (alteration in original); <u>see also</u> Compl. ¶ 53.)

But there is no suggestion that Frates knew of or had access to the white paper or the meeting with the Secretary—for example, by making specific statements as to the white paper or the meeting, or being present at meetings where these matters are alleged to have been discussed. <u>Cf.</u> <u>Christine Asia Co. v. Ma</u>, 718 F. App'x 20, 23 (2d Cir. 2017) (summary order) (finding it "virtually inconceivable" that adverse information with a "huge potential impact" on

the company was not communicated to the individual defendants based on allegations that high-level company officers who reported directly to defendants attended a secret meeting where the adverse information was revealed); Okla. Firefighters Pension & Ret. Sys., 2019 WL 1247583, at *10-11 (finding scienter based on allegations that individual defendants attended meetings where contradictory information was presented to defendants and reviewed by defendants). Instead, Local 731 claims in effect that Frates would have known solely by virtue of his position as CFO—an argument that courts have rejected. See In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d at 538 (finding insufficient undetailed assertions that defendants had access to adverse information through internal corporate documents, meetings, and reports due to their high-level positions); accord Foley v. Transocean Ltd., 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012).

Local 731 also contends that the alleged fraud relates to a core business or operation of Alkermes. (See Compl. ¶¶ 137-138.) Though that may be so, the overwhelming consensus in this district is that such "core operations" allegations are insufficient—standing alone—to establish scienter. E.g., Okla. Firefighters Pension & Ret. Sys., 2019 WL 1247583, at *11; Wilbush v. Ambac Fin. Grp., Inc., 271 F. Supp. 3d 473, 485 (S.D.N.Y. 2017); Austin Police Ret. Sys. v. Kinross Gold Corp., 957 F. Supp. 2d 277, 296 (S.D.N.Y. 2013); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

3. Corporate Scienter

Because Local 731 also names Alkermes itself as a defendant, this Court addresses whether the Complaint sufficiently alleges corporate scienter, irrespective of whether Local 731 has pleaded scienter for an individual defendant. The Second Circuit instructs that when "the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could

be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Dynex, 531 F.3d at 195).

As for the first avenue, courts in this district do not require the same individual who has made an alleged misstatement on behalf of the corporation to be the same individual whose intent may be imputed to the corporation. E.g., In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 765 & n.14 (S.D.N.Y. 2017); see Silvercreek Mgmt., Inc. v. Citigroup, Inc., 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) (noting that there must still be some nexus between the "misstatements by some individuals and knowledge belonging to some others"). But as explained earlier, Local 731 has not identified any individual whose scienter may be imputed to Alkermes. Although the Complaint alleges that Alkermes' Director of Public Relations acknowledged Alkermes' circulation of the white paper,[3] his knowledge cannot be imputed because he only assumed his position in September 2016—months after Frates made the actionable misstatement. (See Compl. ¶ 50.)

The second avenue also leads to a dead end. Although the Second Circuit has acknowledged that "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant," Dynex, 531 F.3d at 195, it "[has] not since elaborated on when this is the case," Sfiraiala v. Deutsche Bank Aktiengesellschaft, 729 F. App'x 55, 58 n.1 (2d Cir. 2018) (summary order). Nonetheless, courts in this circuit have articulated the standard by reference to Dynex's citation to the Seventh

---

[3]     Certainly, "[w]hile there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." In re Sanofi Sec. Litig., 155 F. Supp. 3d at 409. This Opinion & Order assumes, without deciding, that a Director of Public Relations is of sufficient seniority to serve as such a proxy.

Circuit's formulation, requiring that the corporate statement be so important and dramatic that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." Dynex, 531 F.3d at 195-96 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 710 (7th Cir. 2008)); see, e.g., Thomas v. Shiloh Indus., Inc., 2017 WL 2937620, at *2 (S.D.N.Y. July 7, 2017); In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013); Vining v. Oppenheimer Holdings Inc., 2010 WL 3825722, at *13 (S.D.N.Y. Sept. 29, 2010). For example, the Seventh Circuit explained that if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero," there would be a strong inference of corporate scienter, despite the ability to "name the individuals who concocted and disseminated the fraud." Makor Issues & Rights, 513 F.3d at 710. Whatever the contours of this corporate scienter theory, this Court is not convinced that Frates' July 28, 2016 misstatement is in the same league.

III.     Section 20(a) Claim

Defendants also seek to dismiss the Section 20(a) claim based on the lack of a primary violation. Section 20(a) of the Exchange Act "provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." Blanford, 794 F.3d at 305 (citing 15 U.S.C. § 78t(a)) (alteration in original). To plead a prima facie case of control person liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Gruber v. Gilbertson, 2018 WL 1418188, at *15 (S.D.N.Y. Mar. 20, 2018) (quotation mark and citation omitted). Based on Local 731's failure to adequately plead a primary violation, the Section 20(a) claim is also dismissed. Nguyen, 297 F. Supp. 3d at 501.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted. The Complaint is dismissed with prejudice, as this Court previously informed the parties during pre-motion proceedings that leave to replead would not be granted if Defendants prevailed on this motion.[4] The Clerk of Court is directed to terminate the motions pending at ECF Nos. 36 and 41 and mark this case as closed.

Dated: March 28, 2019
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

---

[4]     See <u>DigitAlb, Sh.a v. Setplex, LLC</u>, 284 F. Supp. 3d 547, 556-57 (S.D.N.Y. 2018) ("Courts have dismissed claims with prejudice on the basis that the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies." (citation and quotation marks omitted)).